McCALEB, Justice.
 

 Keller Construction Company instituted this suit against George W. McCoy & Co. Inc., and McCoy’s insurer, the Employers Liability Assurance Corporation, Ltd., to recover $28,675.23, plus interest and attorneys’ fees, as damages sustained by it allegedly as a result of McCoy’s default on a subcontract with Keller to install part of the sewerage system for a housing subdivision situated near Lake Pontchartrain in the city of New Orleans, constructed by Keller under a general contract with the owner and developer, Pontchartrain Park Homes, Inc.
 

 Keller’s demand is levelled mainly against McCoy for the damages suffered from the latter’s refusal to repair certain breaks in a sewer line constructed under the sub-contract. But, pleading in the alternative, Keller joined Pontchartrain Homes as a- party defendant, seeking to hold the latter responsible for its losses, in the event of the rejection of its demand against McCoy on the ground that the sewer line breaks were attributable to defective plans and specifications furnished by the Sewerage & Water Board of New
 
 *531
 
 Orleans, as agent for Pontchartrain, for the sewerage construction executed
 
 by McCoy.
 

 The events which give rise to the litigation are as follows :
 

 In April, 1950 the City of New Orleans adopted an ordinance to cooperate in the development of a housing project then contemplated by Pontchartrain Park Homes, Inc. and, on November 10, 1954, the Sewerage and Water Board passed a resolution in which it conferred authority on its President to enter into a contract with Pontchartrain for installation of sewer and water systems in Pontchartrain Park Subdivision.
 

 Conformably with this resolution, the Sewerage and Water Board and Pontchartrain Park Homes, Inc., on January 24, 1955, entered into a contract which reads, in part, as follows:
 

 “6.
 
 The Board will furnish engineering plans, specifications, contract documents and inspection for the project.
 

 “7. The Developer agrees and binds itself, at its entire expense, to install a sewerage collection system, complete with house connections with .the following exceptions: That the house connections on the offsite approach main to' Section 1 will be installed at the expense of the Sewerage & Water Board at the time requests for these ^connections are made, but the necessary Ys and Ts and the stand pipe in the main line will be furnished by the Developer.
 

 “8. The Board will furnish to the Developer engineering plans, specifications, contract documents and inspection for the sewerage collection system, water distribution system and the outfall trunk drainage, but not for subsurface drainage. The object being that said work shall be done in accordance with plans and specifications of the Sewerage & Water Board and under the supervision and inspection of its engineers.
 

 “9.
 
 It is agreed and understood that the sewer and water mains and drainage facilities are to be installed in streets or servitudes dedicated or granted to the City of New Orleans or the Sewerage & Water Board of the City of New Orleans as the case may be.”
 

 A short time prior to making the above cited contract, Pontchartrain had entered into a general contract with Keller Construction Corporation in which Keller agreed to “furnish all the necessary labor, material and equipment to accomplish Sewerage Lines, Water Lines, Street Drainage Lines, Grading, Street Paving, Lot Filling and Sidewalks in Pontchartrain Park Subdivision.” Made applicable to this contract were “General Specifications of the Sewerage and Water Board of New
 
 *533
 
 Orleans where applicable”, and “Sewerage and Water Board of New Orleans Drawing No. 5324-G-3 dated 9-23-54 entitled 18", 15", 12" and 8" Vitrified Clay Pipe Sewers to be laid in Pontchartrain Park.”
 

 Keller then made a sub-contract with McCoy in which McCoy agreed “to furnish all material and perform all work necessary to complete the installation of all sanitary sewers and appurtenances in Section 1 of the Pontchartrain Park Subdivision. According to the plans and specifications and Addenda (details thereof to be furnished as needed) of Sewerage and Water Board of New Orleans, Architects.” Article 8 of the sub-contract reads as follows:
 

 “Article 8. Guarantee: The SubContractor shall warrant and guarantee all material and workmanship furnished by him to be free of defects and to comply fully with the provisions of this agreement for a period of one year from the date of acceptance of the work.”
 

 Subsequently McCoy began to lay the sewer in accordance with the plans and specifications furnished him. An “instrument man” from the Sewerage and Water Board established the elevations which McCoy was to follow, and an “inspector” from the Board supervised every detail of McCoy’s work to see that he followed the plans and specifications exactly. However, when McCoy finished his work and tested the sewer line, the system developed leaks, due to pipe breakage. Thereupon, Keller called upon McCoy to repair the leaks and McCoy repaired seven leaks but left the job and refused to make any further repairs when it .became apparent that Keller and Pontchartrain would not reimburse it for the cost of those repairs. Keller then proceeded to make repairs as other breaks in the lines (nine in number) developed during the next four months. The job was finally accepted by the Sewerage and Water Board, but a number of breaks developed afterwards which the Board had to repair.
 

 Keller alleges in its petition that the breaks in the sewer resulted from faulty workmanship, use of faulty materials or some other dereliction on the part of McCoy in the execution of the sub-contract and that, accordingly, the latter is liable for all costs and expenses incurred by Keller in performing the requisite remedial work under instructions from Pontchartrain.
 

 McCoy and its insurer denied the charges of fault contained in Keller’s petition and McCoy filed a claim in reconvention for recovery of $33,384.56. In this demand McCoy alleged that, on or about June 21, 1955, it had fully complied with its' contract to furnish all material and perform all work necessary to complete the installation of all sanitary sewers and appurtenances in Section 1 of Pontchartrain Park Subdivision “ * * * According to plans and specifications of the Sewerage & Water
 
 *535
 
 Board of New Orleans, Architects”; that the job was executed in workmanlike manner ; that the breaks which occurred in the sewer line were caused solely by the weight of the sand covering said line and that, therefore, it was entitled to recover the cost of the seven sewer repairs made by it amounting to $17,248.69, plus the retainer of $10,896.60, admittedly due by Keller on the approximate contract price. In addition, McCoy sought reimbursement from Keller for the cost of lowering one manhole and for certain costs involved in house to sewer connections which were incurred as the result of changes made by the Sewerage & Water Board in its plan after McCoy’s bid had been accepted.
 

 Confronted with McCoy’s reconventional demand, Keller filed a third party complaint against Pontchartrain in which it was alleged that McCoy had been paid for changes in the house to sewer connection plans in accordance with the terms of the sub-contract but that, should the Court hold that McCoy is entitled to recover any costs or expenses because of defective plans furnished by Pontchartrain to Keller and, in turn, by Keller to McCoy, then Keller is entitled to recover from Pontchartrain the amount of any judgment awarded against it in favor of McCoy.
 

 In answer to Keller’s third party complaint, Pontchartrain asserted that, if there were any defects in the plans and specifications, it was the duty and responsibility of Keller to save Pontchartrain from loss in connection therewith and that in no event was it liable to Keller for any judgment which might be rendered against Keller in. favor of McCoy.
 

 Subsequently, McCoy and its insurer called in the Sewerage and Water Board as third party defendants and, after alleging that the Board had prepared all plans and specifications for the sewerage; that the work had been performed under the Board's supervision and control and that the breaks in the sewer line were caused by defects in the plans, they prayed that, should judgment be rendered against them, a like judgment should be rendered in their favor against Sewerage and Water Board.
 

 On the issues thus formed by the pleadings, a trial was had and Keller was awarded judgment on its main demand against McCoy and its insurer as prayed for. The judge also dismissed all incidental demands and third party complaints except the re-conventional demand of McCoy against Keller. This demand was sustained but only to the extent of $1152.85, for reimbursement to McCoy for the cost of lowering one manhole in compliance with the Sewerage and Water Board’s order
 

 McCoy and its insurer have appealed from the adverse decision. Keller has appealed from that part of the decree which sustained McCoy’s reconventional demand to the extent of $1152.85 and dismissed its
 
 *537
 
 third party complaint for judgment against Pontchartrain for any amount which might be recovered against it by McCoy.
 

 It is seen from the foregoing statement that the case involves numerous claims and counter claims. However, the principal basis of Keller’s suit is that the breaks in the sewer lines were due to McCoy’s faulty workmanship, use of defective materials or some other fault and that, in any event, McCoy is liable for Keller’s damages under the terms of the contract irrespective of any fault on its part.
 

 On the other hand, McCoy’s position is that it has performed the work required of it by the subcontract in strict accord with the plans and specifications, which were warranted to be adequate by Keller, as prime contractor, and that the breaks in the sewer line resulted exclusively from defective plans and specifications of the Sewerage and Water Board in providing for the use of standard strength sewer pipe at depths and under circumstances requiring the use of extra strength pipe in order to insure safety.
 

 The trial judge was of the opinion that McCoy was liable even though the breaks were caused by defective or insufficient plans and specifications for the reason that Pontchartrain did not expressly or impliedly warrant the plans. He then found as a fact that there was no proof that the plans and specifications were inadequate but that, on the contrary, “ * * * the record reeks with evidence that the breaks in the pipe were due to improper procedure by McCoy in not laying the pipe in a perpendicular trench to avoid the full weight of the backfill.”
 

 Since McCoy’s defense to the case is primarily conditioned upon the proposition that Keller warranted the adequacy of the plans and specifications, we address our immediate attention to a discussion of this question.
 

 The applicable Articles of the Civil Code respecting construction contracts and the liability thereunder of the undertaker are Articles 2756 and 2758, which read as follows:
 

 “Art. 2756. To build by a plot, or to work by the job, is to undertake a building or a work for a certain stipulated price.”
 

 “Art. 2758. When the undertaker furnishes the material for the work, if the work be destroyed, in whatever manner it may happen, previous to its being delivered to the owner, the loss shall be sustained by the undertaker, unless the proprietor be in default for not receiving it, though duly notified to do so.”
 

 If the last quoted article is taken literally, it would appear that McCoy must bear the cost of repairs to the sewer in the
 
 *539
 
 case at bar, since it was “destroyed” before being delivered to Keller or Pontchartrain. However, McCoy seeks to avoid liability under an exception to Article 2758 which has developed in the jurisprudence of this State. The rule and its exception was expressed in Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819, thus:
 

 “The general rule is that, if destruction of a work during the course of construction is caused by defective, inadequate, or insufficient plans and specifications furnished by the owner, the contractor is nevertheless liable.
 
 [1]
 

 * * * An exception to this rule is recognized where the owner expressly or impliedly warrants the sufficiency of the plans furnished by him. * * * ” See 215 La. at page 917, 41 So.2d at page 829.
 

 Later on in the Brasher opinion on rehearing, the Court quoted with approval from 6 Williston on Contracts, Rev.Ed., Sec. 1966, pp. 5515-5518, as follows:
 

 “Even though the plans upon which a contractor undertakes to construct a building are so defective as to cause the building to fall while in course of erection, he is
 
 not
 
 generally relieved from liability.
 

 “The propriety of these decisions depends upon the question whether the owner can be regarded as warranting the sufficiency of the plans. If the owner through his architect or engineer can be regarded as having superior expert knowledge, and on the basis of such knowledge to represent to the builder the feasibility o¿ carrying out the plans, the owner must be held responsible for the consequences of any defects in them. In ordinary cases, perhaps, the builder may be supposed to have sufficient knowledge of what is feasible to make unfounded the assumption of justifiable reliance by him on the superior knowledge of another; but where the work in question involves technical engineering
 
 *541
 
 skill, and the plans are made by expert professional men engaged by the owner, there seems good reason for implying a warranty.”
 

 There is no dispute in the case at bar that Pontchartrain, the owner, supplied detailed plans and specifications prepared by the Sewerage and Water Board to Keller, the contractor, who in turn supplied those plans and specifications to McCoy, the subcontractor.
 
 [2]
 
 Furthermore, it is obvious from the record that Pontchartrain and Keller, through their architect and engineer, the Sewerage and Water Board, were to be regarded as having superior expert knowledge respecting sewer construction and, on the basis of such knowledge, they represented to McCoy the feasibility of carrying out the plans, for the evidence indicates that S&WB inspector watched everything done by McCoy and could have stopped the work if any deviation from the plans and specifications had been attempted. The work involved technical engineering skill and the plans were made by expert professional men engaged by the owner.
 

 Under these circumstances, it is manifest that this case is parallel to United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 61, 63 L.Ed. 166, where the Court said:
 

 “But the insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that if the specification were complied with, the sewer would be adequate.”
 

 Accordingly, we hold that Pontchartrain warranted the sufficiency of the sewer plans to Keller, and Keller, in turn, warranted the sewer plans to McCoy.
 

 Determination that the plans and specifications were warranted to McCoy as adequate leads us to a consideration of the facts of the case — for, obviously, since McCoy is relying on an exception to the general rule, it carried the burden of establishing that the breaks in the sewer line were due exclusively to the specifications of pipe of insufficient strength, as asserted in its defense. And, in order to demonstrate this, McCoy was necessarily required to show that he executed the subcontract properly. We therefore shall first undertake a discussion of whether McCoy has discharged its contractual obligation to
 
 “
 
 *
 
 ‡ *
 
 furnish all material and perform the work necessary to complete the installation of all sanitary sewers and appurtenances * * * according to the plans and specifications and addenda * *
 
 *543
 
 of Sewerage and Water Board of New Orleans, Architects”.
 

 At the outset, it should be stated that Keller offered no proof of its allegations that McCoy’s workmanship and materials were defective. Keller presented only one witness, its Vice President, Mr. Charles H. Hill, whose testimony on direct examination referred mainly to the breaks in the line repaired by Keller and who, on cross-examination, conceded that he did not know of any faulty workmanship in the performance of McCoy.
 

 However, McCoy assumed the burden of showing that the breaks were not caused through any improper or defective workmanship on its part, its work supervisor, Mr. William McCoy, pointing out very plainly why this was so. He testified to every detail of the construction, describing how the trenches were made, how the shells were put in the trench, how the pipes were joined, how the well points were operated, how the backfilling was done and indicated that every aspect of the work had been performed in accord with the standard and well accepted practices used in laying the type of sewer here under consideration.
 

 The testimony of Mr. McCoy was fully corroborated by defense witness, Joseph J. Lesslie, who had been the Sewerage and Water Board Inspector on this particular job and there was every indication that McCoy’s work was done exactly as Mr. Charles H. Hill (Civil Engineer and Vice President of Keller), Mr. William P. Kelly (contractor who installs sewers for KellyGeneres), Mr. Clement Betpouey, Jr. (General Contractor for 25 years), Mr. Fred Schmidt (Supervisor of Sewer Maintenance for S&WB), Mr. S. V. Apple-white (Consulting Engineer, specializing in Sanitary Engineering), and Mr. John J. Porte (Assistant Engineer, S&WB Design Department) had testified that it should have been done.
 

 In view of the evidence, we are satisfied that McCoy has shown that it complied with its obligation of good workmanship.
 

 The testimony as to whether the vitrified clay pipe used by McCoy was defective is not in serious dispute notwithstanding that counsel for Keller, Pontchartrain and the Sewerage and Water Board have attempted to make it a major issue in this casé. The pipe came from a plant of the W. S. Dickey Clay Pipe Manufacturing Company in Meridian, Mississippi, which had just begun operations at the time it delivered pipe to McCoy. There was evidence that the Meredian plant rejected more pipe than Dickey’s Birmingham plant, but Mr. Frank G. Jones, the Manager of the New Orleans office and yard testified, without contradiction, that this was because the Meridian inspectors were more
 
 *545
 
 careful than the Birmingham inspectors, and therefore found more defective pipe.
 

 Mr. Jones also stated that every piece of pipe sent to McCoy was tested by the Mississippi Testing Laboratory to determine if it met the minimum requirements for the pipe as set by the American Society of Testing Materials (A.S.T.M.), and that no pipe was delivered to McCoy without the Laboratory stamp certifying that the pipe had met the ASTM requirements. In addition, McCoy submitted in evidence cerificates of the Mississippi Testing Laboratories, which showed that the pipe sent to McCoy had all been tested and stamped “MTL”, and William McCoy and Joseph J. Lesslie (The S&WB inspector on the McCoy job) both declared that all pipe used by McCoy was reinspected on the job; that all bore the mark “MTL” and that any found defective was rejected on the spot.
 

 Mr. Jones testified that the Dickey Company tried to send out pipe that was 100% good and that the Company always replaced any pipe which was rejected for any reason after it reached the job. The testimony indicated that the amount of pipe rejected on the McCoy job was normal, and defects found therein were due to careless handling of the pipe after it left the factory.
 

 Manifestly, as shown by the evidence, it is impossible to test the crushing strength of each piece of pipe because the pipe is actually crushed in the test. Hence, any inspection at the job site can only be for breaks in the pipe, since the crushing strength cannot be tested at that point, and the testing laboratory’s stamp of approval must necessarily be sufficient evidence of the proper strength of all pipe in a shipment.
 

 There was no direct evidence that the pipe used by McCoy had deficient crushing strength, but Mr. E. F. Hughes, General Superintendent of the S&WB, testified that, after experiencing so much trouble with the McCoy job, he selected at random four pieces of Dickey pipe which had been made in Meridian and stamped MTL, and subjected them to a laboratory crushing test. He indicated that three of the four pieces of pipe failed the test but the testimony on this point is so devoid of detail (i. e., he did not indicate the size tested or the weight used) as to be practically worthless.
 

 We do not regard the single and belated pipe strength test of the S&WB as sufficient to rebut the prima facie showing by McCoy that the pipe used by it in the execution of the contract had been properly tested in accordance with the A.S.T. M. requirements by an appropriate regulatory body and found to be of adequate strength. Indeed, it is rather unseemly for the Board to be assailing the materials of the Dickey Company, which it has used
 
 *547
 
 for years, and, furthermore, the fact that it continued to use the pipe from the Meridian plant, even after the test, indicates that the Board must have felt that Mr. Hughes’ crushing test was inconclusive.
 
 [3]
 

 After considering the testimony as a whole, we conclude that McCoy has established that the breaks in the sewer line did not result from defective materials.
 

 The next question then for decision is whether McCoy has shown that the breaks in the line resulted from a deficiency in the plans and specifications provided by the Sewerage and Water Board, which Keller warranted to be adequate. It is McCoy’s position that the plans specified the furnishing of standard pipe at depths which required extra strength pipe to withstand the weight to which it was subjected. The sewer pipe specifications on which McCoy bid the job were, in part, as follows :
 

 “2. Furnishing and installing fifteen (15) inch standard strength vitrified clay pipe sewers, 16' — 17' deep (340 lin. ft.)”
 

 “3. Furnishing and installing fifteen (15) inch standard strength vitrified clay pipe sewers, 15' — 16' deep. (790 lin. ft.)”
 

 "4.
 
 Furnishing and installing fifteen (15) inch standard strength vitrified clay pipe sewers, 14' — 15' deep (620 lin. ft.)”
 

 “5. Furnishing and installing twelve (12) inch standard strength vitrified clay pipe sewers, 14' — 15' deep (75 lin. ft.)”
 

 “6.
 
 Furnishing and installing twelve (12) inch standard strength vitrified clay pipe sewers, 13' — 14' deep, (520 lin. ft.)”
 

 “7. Furnishing and installing twelve (12) inch standard strength vitrified clay pipe sewers, 12' — 13' deep (370 lin. ft.)”
 

 “8. Furnishing and installing ten (10) inch standard strength vitrified clay pipe sewers, 12' — 13' deep (150 lin. ft.)”
 

 “9. Furnishing and installing ten (10) inch standard strength, vitrified
 
 *549
 
 clay pipe sewers, ll'-12' deep, (295 lin. ft.)”
 

 Testifying for McCoy was Mr. S. V. Applewhite, a consulting engineer, specializing in sanitary engineering, who has done sewer work all over Louisiana since 1926. It was Mr. Applewhite’s opinion that the 10", 12" and 15" pipe specified for use by the Sewerage and Water Board was inadequate to support the load that was on it at the depths required. In explanation of this view, Mr. Applewhite asserted that he went out to the site of the sewer in question while Keller was repairing one of the breaks and checked the trench load on a segment of 15" pipe which had 16%oths feet of cover. He found the trench load on the pipe at that point to be 2500 pounds per lineal foot, and he testified that he recommended to Keller that extra strength pipe be used in the repair because the recommended safe load for the standard strength 15" pipe was about 2000 pounds per lineal foot.
 

 Mr. Applewhite further testified that he checked the 12" pipe with 12.2 feet of cover and found that it had a load of roughly 2000 pounds per lineal foot, whereas, a safe load for 12" pipe should not exceed 1700 pounds. He also found that the 10" pipe was supporting 1650 pounds on the McCoy job which was excessive, as standard strength pipe could not safely support more than 1570 pounds per lineal foot.
 

 The only other witness who qualified as an expert on sewer engineering
 
 [4]
 
 was Mr. John J. Porte, Assistant Engineer in the S&WB design department. Mr. Porte testified that the load on a 15" pipe with a depth over the top of the pipe of 15 feet, for a trench of 3 feet 6 inches in diameter is 2790 pounds per lineal foot. He went on to say that a standard strength pipe under those conditions, allowing for shell support and a tamp backfill, would support approximately 2800 to 2900 pounds per lineal foot. However, Mr. Porte admitted that the manual of the Southern Clay Pipe Manufacturers, which gives figures on the loads each pipe can carry, specifies that a standard strength 15" pipe under the specified conditions would support only 2350 pounds per lineal foot. He explains, nevertheless, that the many years experience of the Sewerage & Water Board has enabled it to determine that the standard strength 15" pipe will support more weight than the Southern Clay Pipe Manufacturers Manual recommends. However, it is to be noted that the
 
 general
 
 specifications of the S&WB set out that
 
 extra
 
 strength vitrified clay
 
 *551
 
 pipe, laid as the specifications require, would support only 2750 pounds per lineal foot.
 

 After considering the testimony of both of these experts, in connection with other circumstances in the case, it appears to us that Mr. Applewhite’s opinion is the more consistent and believable. Mr. Porte failed to contradict Mr. Applewhite’s testimony concerning the strength of the 10" and 12" pipe, and we are convinced that his opinion is contrary in a number of particulars to other circumstantial evidence which points to the conclusion that the specification of standard strength pipe for the sewer construction work in this instance was contrary to good practice. Indeed, even if we accepted Mr. Porte’s testimony completely, it would appear that the margin of safety allowed by him in the 15" pipe specifications on the McCoy job was too slim to be considered prudent.
 

 One indication that Mr. Porte had misgivings about specifying standard strength 15" pipe for the McCoy job is found in the fact that he had originally provided for standard strength 15" pipe for use' in the sewers of Section 2 of Pontchartrain Park Subdivision (which were being installed by Kelly-Generes), but changed the specifications for some sewer pipe in the eastern part of Section 2 to extra strength, after experiencing trouble with the McCoy job.
 
 [5]
 
 Section 2 is adjacent to Section 1, and, as a matter of fact, all of the 15" pipe laid by McCoy ran through the eastern part of Section 2 and connected the Section 1 sewerage system (which had been installed by McCoy) with an existing 21" sewer main which lay across the eastern part of Section 2 from Section 1. Thus, it seems to follow that the S&WB realized its mistake in specifying standard strength 15" pipe for the eastern part of Section 2, and changed the specifications so that the contractor laying the Section 2 sewer would not experience the same troubles as McCoy.
 

 Mr. Porte, who was responsible for the Pontchartrain Park sewer design, admitted that some of the Section 2 pipe specifications had been changed after the difficulties with the McCoy job. He said that the change was not made because the Board was admitting any mistake in the project, but that the change was made as an "insurance”. It is obvious from this testimony that Mr. Porte must not have been certain that his original specifications were adequate, and that he felt that the standard strength 15" pipe might well have been too weak for the eastern part of Section 2.
 

 
 *553
 
 There were other indications that standard strength 15" pipe was inadequate for the McCoy job. Mr. Frank Jones, the New Orleans manager of the Dickey Pipe Company, testified that he visited the McCoy job and noticed the depth of the trench and the wetness of the soil, and, when he was told that standard strength and not extra strength 15" pipe was going in, he became concerned about its adequacy. He testified that he told Fred Schmidt, S&WB Supervisor of Sewer Maintenance, about the situation to see if anything could be done to “forestall a possible failure”. Mr. Doyle, the S&WB Construction Superintendent, testified that Mr. Schmidt brought the situation to his attention and that he, in turn, pointed it out to Mr. Wood, who was the General Superintendent of the Sewerage and Water Board. Mr. Doyle said that Mr. Wood told him that he would check into it and, if there was any deviation, he would let Mr. Doyle know, but that Mr. Doyle heard nothing more from Mr. Wood on the matter and assumed that there was no objection to the standard strength pipe.
 

 Mr. Lesslie, the S&WB inspector on the McCoy job, testified that, when he found that single strength 15" pipe was to be used, he called Mr. Doyle to come out to the job. Lesslie further stated that he showed Mr. Doyle the single strength pipe and questioned its use, but was told by Mr. Doyle the next day that the pipe was specified and should be installed.
 

 Neither Mr. Jones, Mr. Schmidt, nor Mr. Lesslie are engineers, and the only reason that they would have any misgivings about the pipe would
 
 be
 
 because of their experience in sewer construction. Yet the imprudence of using single strength 15" pipe in the McCoy job occurred to them. The evidence shows that they, as well as McCoy, had no choice but to follow the directions of the S&WB, whose complete authority as to engineering details had been granted by its contract with Pontchartrain and set out in the S&WB general specifications which were a part of Keller’s and McCoy’s contracts.
 

 In pointing out evidence which, they allege, shows why this Court should find the specifications adequate, Keller, Pontchartrain and the Sewerage and Water Board rely heavily on the fact that McCoy and Keller made all repairs with standard strength pipe
 
 [6]
 
 and that all but two of those repairs held up. However, there is no expert testimony in the record to show that this circumstance indicated that standard
 
 *555
 
 strength pipe was adequate for the McCoy job. On the contrary, the fact that the last two of the nine repairs made by Keller broke again seems to support the opposite conclusion, in view of the fact that Keller, on orders of the S&WB, completely sheeted the ditch in making all but the last two of its repairs. The S&WB specifications which McCoy followed required no sheeting but allowed the sewers to be laid by open cut method, and the change of method by Keller, plus the fact that Keller used shorter lengths of pipe in the repairs than McCoy used originally, may indicate why it experienced only two breaks, even though standard strength pipe was used. At any rate, the method of Keller’s repairs differed from McCoy’s methods enough to eliminate any evidentiary value in comparison of Keller’s results with McCoy’s.
 

 Mr. Applewhite testified that the McCoy job was a borderline case, apparently meaning that slight variations 'in one factor or another would determine whether one segment of pipe would break or not. This was obviously recognized by the S&WB maintenance department because Mr. Schmidt testified that he used extra strength pipe in all the repairs which he made after the S&WB took over the sewer here in question. Furthermore, Mr. Apple-white, knowing that many of the breaks in the McCoy sewer had been repaired with standard strength pipe which did not later collapse, nevertheless was of the opinion that the pipe originally specified by the S&WB for the McCoy job was inadequate.
 

 None of the witnesses testified directly that the use of standard strength pipe rather than extra strength pipe actually caused the breaks in the sewer involved in this case, for most of them said that it was impossible to determine the exact cause of the breaks. Most of the witnesses did agree that, in addition to insufficiently strong pipe being a possible cause of the failures, those failures could also have been caused by defective pipe, improper trenching, improper bedding, lateral movement of the pipe in the trench, improper joining of pipe, improper operation of well points, or improper backfilling. However, as pointed out previously, it has been proved to our satisfaction that there was nothing improper in McCoy’s workmanship and the materials furnished by it were not defective. Therefore, since the evidence plainly shows that the plans and specifications of the Sewerage and Water Board were deficient in that they specified IS", 10" and 12" pipe of insufficient strength to carry the weight resting upon it, the conclusion seems inescapable that such defective specifications must have been the cause of the sewer failures involved in the case.
 

 In his written reasons, the district judge expressed the view that the pipe must have been of sufficient strength since only segments of the line collapsed and he stated
 
 *557
 
 that, if the pipe had not been of sufficient strength,
 
 “a
 
 fair assumption would be that the entire line would have collapsed, not just a few segments here and there”.
 

 We cannot subscribe to this view as there is nothing in the evidence to indicate that, if the pipes had not been of sufficient strength to support the weight of the soil covering them, the entire sewer line would have collapsed. The proof was that the specification of standard strength pipe for the sewerage line was inadequate and contrary to safe practice. The circumstance that the entire line did not collapse does not, of itself, contradict the preponderating proof and affords no basis for an assumption that the pipe specified must have been adequate.
 

 Since Pontchartrain warranted the sufficiency of the Sewerage and Water Board plans and specifications to Keller, and since Keller, in turn, warranted the Sewerage and Water Board plans and specifications to McCoy, it follows that Keller is liable to McCoy on its reconventional demand for the costs incurred by McCoy in repairing breaks in 15", 12" and 10" sewer pipe, and Pontchartrain is liable to Keller on its alternative demand for the costs incurred by Keller for repairs which it made to breaks in 15", 12" and 10" sewer pipe. Moreover, Keller is further entitled to recover over against Pontchartrain the amount for which it is liable to McCoy, since Keller is liable to McCoy only because of warranting the exact same plans and specifications which Pontchartrain warranted to Keller. In other words, Keller should not be liable for the destruction of the work, because the destruction was caused by defective plans and specifications furnished by the owner, Pontchartrain. However, Keller, having been successful below against McCoy, could not pursue its alternative demand against Pontchartrain on this appeal, and it is also to be noted that Pontchartrain sought by verbal pleadings to hold the Sewerage and Water Board on the contract between them (and it may be that some liability exists although we, of course, express no opinion whatever as to that question). Therefore, in order to further the ends of justice and allow all parties to amend their pleadings and argue the unsettled issues in this lawsuit, the case will be remanded (under Article 906, Code of Practice), for formal amendments to the pleadings and for the hearing of any testimony on any issues responsive to the pleadings.
 

 Having disposed of the main issue of the litigation, we pass on to a consideration of whether McCoy is entitled to recover on its reconventional demand for the cost of altering a manhole and the cost of changing certain sewer to house connections. McCoy’s allegations concerning the manhole are that, during the course of the job, it became necessary to change the elevation of a manhole after the same was completed,
 
 *559
 
 because an error was committed in the plans and specifications covering the construction of the manhole, and, in compliance with orders from Keller, the necessary change was made at a cost of $1,-152.85, However, the evidence shows that the manhole problem was not caused by any error in the S&WB plans or specifications, but that it occurred because the S&WB “instrument man” set out on the “batter board” the wrong elevation of the manhole “invert”, and McCoy, in following the erroneous elevation indication, built the manhole improperly.
 

 In brief before this court, Keller resists this reconventional demand on several grounds. First, it is contended that McCoy was liable under the express provisions of paragraphs 37, 38, 43 and 45 of Section A and paragraph 75 of Section D of the Water Board’s specifications. However, the cited paragraphs
 
 [7]
 
 merely make the contractor responsible for defects in materials or workmanship which have been caused by the contractor’s neglect, and do-not allow the contractor relief in such cases just because the work has been inspected and approved by the S&WB. On
 
 *561
 
 the other hand, the cited paragraphs do not render the contractor liable for errors
 
 caused
 
 by the S&WB. There was no evidence that the manhole in question had to be changed because of McCoy’s defective materials or workmanship. On the contrary, all the evidence shows that McCoy had built the manhole in exact conformity with S&WB requirements, the only error being that McCoy was given the wrong manhole elevation to follow by the S&WB “instrument man”.
 

 William McCoy testified that, after the S&WB engineer laid out the elevations, there was no way for him to know whether the correct elevation was given unless he brought in his own engineer to check on the S&WB. He further declared that, when the manhole was two-thirds constructed, he noticed that the pipe had gone in the manhole at one elevation and come out a foot higher; that it is common practice to change elevations like that in some cases, but that he was not sure that such was proper in this case, and that he questioned the S&WB inspector about it. The testimony indicates that the inspector called his superior, who came out to the job, saw the mistake that had been made, and ordered the manhole rebuilt to the proper elevation.
 

 It appears from the testimony that McCoy discovered the mistake as soon as it was possible for him to do so. The S&WB inspector on the job testified that the one foot difference in elevation was obvious. However, it is evident from the record that even the inspector did not notice the difference or realize that it was error until McCoy directed his attention to it and that, even then, the inspector was not certain that an error had been made until he called his superior and was told that the pipe should enter and leave the manhole at approximately the same elevation.
 

 McCoy was hired by Keller to do the physical construction work under the direction and supervision and according to the plans and specifications of the Sewerage and Water Board. He was not to lay out any elevation, but was to construct in accordance with those elevations laid out by S&WB employees.
 
 [8]
 
 In constructing the manhole improperly, McCoy was merely following the guidance which the owner, Pontchartrain, and, in turn, the principal contractor, Keller, had obligated him to follow. As soon as McCoy suspected that an error had been made, he stopped the work and proceeded to determine what, if anything, was wrong and how he could make a correction as soon as possible. It is apparent that there was nothing negligent in
 
 *563
 
 McCoy’s action, and that the mistake was entirely the fault of the Sewerage and Water Board.
 

 The plans and specifications of the S&WB, which set out how the S&WB was to plan and control the work of sewer installation,
 
 [9]
 
 were made applicable to Keller’s contract with Pontchartrain, and were made applicable to McCoy’s contract with Keller. Thus Pontchartrain, by giving the S&WB control in its contract with Keller, instituted the S&WB as its representative to plan and supervise any sewer construction which Keller might undertake for Pontchartrain. In turn, Keller, by specifying in its contract with McCoy the complete control of the S&WB over the design and installation of the sewer system, made the S&WB its representative to plan and supervise all sewer construction done by McCoy. Therefore, it seems to follow that Keller is responsible for any damage caused to McCoy through improper performance by the S&WB of its work as supervisor for Keller, and Pontchartrain is liable, in turn,, to Keller for any damage caused to Keller by the S&WB in its work as supervisor for Pontchartrain. Furthermore, it may be that the S&WB is responsible to Pontchartrain for any damage caused Pontchartrain through improper performance by the S&WB of its contract with Pontchartrain. However, this issue will have to be determined from the pleadings and evidence adduced on remand.
 

 Keller’s second defense to recovery for reconstruction of the manhole is that the S&WB refused to recognize the validity of McCoy’s claim and that the contract gave-the S&WB general superintendent the power to make unappealable decisions as: to whether extra work had been performed and whether the contractor should receive-any compensation therefor. Keller asserts.
 
 *565
 
 that paragraph 21 of Section A of the Water Board’s specifications gave the Water Board Superintendent that power.
 
 [10]
 

 There is no merit in the contention. The contract cannot be fairly construed to vest in the S&WB the right to refuse to compensate the other party for ■damages caused by its own failure to properly perform the contract. The language in the contract, referred to by Keller, merely makes the General Superintendent of the S&WB the final authority as to the fulfillment of the contract
 
 “on the part of the
 
 ■contractor”. Furthermore, if a contractor were to contest a ruling of the General Superintendent under the cited paragraph, there is no doubt that the contractor could sue for any claim he had, and that the ■courts would have the power to consider the propriety of the Superintendent’s ruling. Therefore, neither Keller nor McCoy was concluded in the matter of the manhole change by an improper decision of the S&WB General Superintendent.
 

 Finally, Keller seeks to escape liability under McCoy’s guarantee in the subcontract that all of its work would be in •compliance with the Water Board’s plans. But, as pointed out before, the evidence indicates that McCoy attempted to build in accordance with the Water Board’s plan and, as soon as it realized that the work had varied from the plan, it stopped the work and made the necessary correction. Since the variance from the plans was caused by the S&WB, as Keller’s supervisor, Keller can hardly disclaim responsibility for it, or for correction of the error, which was ordered by the Sewerage and Water Board in its capacity as Keller’s agent under the subcontract.
 

 The manhole change was not an item of extra work nor a change in plan, because McCoy finally rebuilt the manhole as the S&WB had originally wanted it. Therefore, it is unnecessary to consider the effect, on the question of payment for the manhole change, of the clause in McCoy’s contract which prohibited payment for extra work or changes unless they were agreed to in writing.
 

 On the other hand, the plans and specifications for some 1240 feet of house to sewer connections were
 
 changed
 
 by the Sewerage and Water Board after McCoy’s contract had been made and work had begun.
 
 *567
 
 The change entailed lowering the elevation of those connections by one foot and, as a result, McCoy was obliged to do “extra work” in order to fulfill the requirements of the changes. McCoy reconvened for the amounts it actually expended in changing the house to sewer connections, less the amount it had already received from Keller in payment for the connections which were changed.
 

 Keller has not resisted McCoy’s claim for the extra cost of the changed house connections on the ground that the changes were not agreed to in writing, but contends that any extra compensation due McCoy for the changes has already been paid, as provided for in paragraph 56(D) of the Water Board specifications, which reads as follows:
 

 “(56) The Contractor shall lay 6" pipe sewer house connections from designated openings in the sewers to such points near the property lines as are designated by the Engineer. Details of a standard sewer house connection are shown in one or more of the drawings furnished to bidders. The standard connection will have a depth of not exceeding five (5) feet at the curb line and not exceeding seven (7) feet at the sewer, these depths measured from the existing ground surface to the bottom of the barrel of the house connection pipe. Excavation to depths not greater than those just stated shall be included in the price bid per linear foot for six (6) inch Sewer House Connections,
 
 excavation to greater depths,
 
 when ordered by the Engineer,
 
 will be paid for at the price bid for Extra Excavation.”
 
 (Emphasis supplied.)
 

 McCoy does not deny that it was paid $1 per cubic yard for the extra excavation entailed by the changes in the sewer to house connection plans, but Mr. George McCoy, president of the company, testified that more things were required by the change in plans than just extra excavation and that the changes caused the changed connection work to be more costly than the construction of the main line. He declared that more'pipe and additional fittings were required, but that the most extra expense was caused by the previously unexpected necessity to use well points in laying the sewer to house connections. Mr. McCoy explained that the sub-contractor had to control more water, when laying the changed sewer to house connection, than when laying the main line due to the fact that there was a bed of shell under the pipe which actually acted as a pipe line that was drawing water from the entire project that had been laid. Commenting on this, he said “We had not only to dewater the sand around the house connections, but also to dewater all of the water that was following the pipe lines through the shells laid under the main line.”
 

 
 *569
 
 William McCoy corroborated the above cited testimony by pointing out that he usually laid house connections uphill, away from the bottom of the main line, but that he had to lay the changed house connections below the grade of the main sewer line, which meant that he had to set up a separate well point system for every house connection installation that he made.
 

 Mr. Doyle, S&WB construction superintendent, testified that the only extra work involved in making the house connections in compliance with the changed plans entailed merely the excavation of additional dirt. But he did not contradict, in detail, the testimony given by the McCoy Brothers, nor did he attempt to explain why he thought they were wrong in contending that additional work had been involved in making the changes. Hence, it seems that McCoy sustained the burden of proving that more was involved in making the changes than just excavating a little deeper than originally contemplated.
 

 The evidence shows that the' Water Board had McCoy lower the sewer to house connections when it was discovered that the original plan for those connections placed them at the same elevation as the subdivision’s drainage pipes. The house connections were thus placed under the drainage pipes in order to avoid any interference. Therefore it seems that paragraph 24(A), as well as paragraph 56(D), is applicable to situation. Paragraph 24(A) reads as follows :
 

 “(24) The Sewerage and Water Board reserves the right to change the locations of the structures to be built under this contract for any reason the Engineer deems satisfactory,
 
 whether to avoid obstructions,
 
 either on the surface or
 
 underground,
 
 to avoid cutting expensive pavements (whether intrinsically expensive or expensive because of an excessive price bid), to make better connection with other structures or for any other reason tending towards greater economy or better . construction. Should such changes in the location, alignment,
 
 grade,
 
 form or dimensions of any part of the work under the contract be made by the Engineer, either before or after the commencement of the work, the Contractor shall have no claim against the Sewerage and Water Board on account of such changes but shall accept as full compensation the price bid for each unit of work which he is required to do regardless of whether or not the location of said unit of work shall be as shown in the plans upon which proposals are invited and compared,
 
 provided that such changes of location shall not involve any additional burden or hazard to the Contractor. The Contractor will be compensated for any such ad
 
 
 *571
 

 ditional unavoidable burden or hazards in an amount to be fixed by the Engineer.”
 
 (Emphasis supplied.)
 

 From the foregoing it appears that McCoy is entitled under the contract to be compensated for any additional burden caused by the change in plans. Paragraph 56(D) of the contract specifies the method by which compensation is to be paid for extra excavation done in accordance with changes in the depth of house connections, but paragraph 24(A) directs how the contractor shall be compensated for additional burdens other than extra excavation which are caused by the change in plans.
 

 The record is not clear as to exactly how much
 
 additional
 
 burden fell on McCoy because of the change in plans, or exactly how much of the expenses caused by that burden have already been reimbursed. Furthermore, the Water Board engineer apparently has never attempted to fix the amount of the additional burden on McCoy beyond the amount which he allowed for extra excavation. Therefore, the case should be remanded on this point so that more detailed pleadings and proof can be elicited, and the court can determine the exact amount which McCoy should be reimbursed for the additional burden incurred by it through the Water Board’s change in its plans for house connections.
 

 Just as Keller is responsible to McCoy under the terms of the Water Board Specifications above referred to, so is Pontchartrain bound to reimburse Keller for the additional payment to McCoy, because the same Water Board Specifications were made a part of the contract between Keller and Pontchartrain.
 

 For the reasons assigned, the judgment appealed from is reversed and it is now ordered that there be judgment herein dismissing the main demand of Keller Construction Corporation against the defendants, George W. McCoy & Co. Inc. and the Employers’ Liability Assurance Corporation, Ltd., and that there be judgment in favor of George W. McCoy & Co. Inc. and against Keller Construction Corporation on the reconventional demand in the full sum of $29,298.20, with legal interest thereon from judicial demand, and all costs.
 

 It is further ordered that there be judgment herein in favor of Keller Construction Corporation on its third party complaint and against Pontchartrain Park Homes, Inc. for $1152.85, with legal interest thereon from judicial demand, and costs.
 

 In other respects, the case is remanded to the district court as to all parties for the amendment of pleadings, hearing of evidence and for further proceedings consistent with the views herein expressed.
 

 [1]
 

 . This rule was changed by Act 183 of 1958 (B..S. 9:2771) which reads as follows : “No contractor shall be liable for destruction or deterioration of or defects in any work constructed by him if he constructed the work according to plans and specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner.” However, the new law does not apply in the instant case because the rights of all the litigants wore fixed when suit was filed in 195G and the law was not passed until 1958. Since the above cited law is substantive and not remedial, it can have no retroactive effect (see Henry v. Jean,
 
 238
 
 La. 314, 115 So.2d 363).
 

 [2]
 

 . Under the provisions of R.S. 33:4081, Pontchartrain could have formulated its own plans for the sewer, or left the planning up to the contractor. Those plans would have been subject to approval by the S&WB, and the final work would have been subject to S&WB inspection, but the law does not require that a subdivider must use plans and specifications provided by the S&WB or that he must contract for detailed supervision of sewer construction by the Board. ■ ■ ■
 

 [3]
 

 . In this connection, we note that counsel for Keller, in their efforts to ascribe the breaks in the sewer line to defects in the pipe furnished by McCoy, proclaim that the Mississippi testing system is deficient because “ * * * if less than
 
 15%
 
 of a shipment failed to meet specifications, the entire shipment is approved.”
 

 We find no evidence in the record to support counsel’s statement. The only authoritative testimony on this point was given by Mr. Jones who Said that if more
 
 than 15% of the
 
 pipe
 
 delivered to the
 
 job was found, to be defective after inspection at the site, his company would replace the entire shipment with other pipe. He further stated that his company always endeavors to ship pipe that is 100% good and that it will replace all pipes found to be broken or otherwise defective, irrespective of percentages.
 

 [4]
 

 . Mr. Charles H. Hill, who testified as Vice President of Keller Construction Corporation, is an engineer, but he declined to offer expert testimony on the plan or construction of the McCoy sewer job because he hacl been away from the engineering business and in the construction business for the previous 11 years.
 

 [5]
 

 . The general specifications of the S&WB require e®ira-strength 15" vitrified clay pipe for sewers and drains, but the S&WB design engineers often supercede the general specifications by specifying
 
 standard
 
 strength 15" pipe on certain jobs where they feel the stronger pipe is not needed.
 

 [6]
 

 . The testimony indicates that Keller wanted to make its repairs with extra strength pipe, presumably on the recommendation of Mr. Applewhite, but Mr. Hill, Yiee President of Keller, met with Mr. Wood, General Superintendent of the S&WB, in regard to the type of material to be used in making repairs to the breaks, and Mr. Wood said that in his opinion standard pipe was sufficient and he did not want anything other than that used in repairing the breaks because he wanted to prove it would stand up. .
 

 [7]
 

 . “(37) The inspection of the work at any time shall not relieve the contractor of any of his obligations to fulfill his contract as herein described and any defective work shall be made good and any unsuitable materials may be rejected notwithstanding that such work and materials have been previously overlooked by the Engineer and accepted or estimated for payment.”
 

 “(38) All material and work, whether the quantity, dimensions and quality are shown on the plans or fully specified in the specifications or not, are to be furnished in sufficient quantity and of sufficient dimensions for the proper execution of the work and the quality and workmanship are to be the best throughout.”
 

 “(43) The Contractor shall give his personal supervision to the faithful prosecution of the work and shall keep it under his personal control. In his absence he shall have a competent representative or foreman on the work who shall follow without delay all instructions of the Engineer or his assistants in connection with this contract and shall have full authority to supply equipment, material and labor immediately.”
 

 “(45) When the Contractor has been notified in writing by the Engineer of any requirements or precautions neglected or omitted or any work improperly constructed he shall attend to them at such times as directed; if he fails to do so the Engineer may perform such work at the Contractor’s expense and deduct the cost thereof from any amounts due or to become duo the Contractor.”
 

 “(75) If at any time during the performance of the contract any defects in the sewers, manholes, etc., shall develop or be discovered the Contractor shall properly repair or replace the defective workmanship or material even though such workmanship or material has already passed inspection. If the contract has required the Contractor to furnish the pipes and fittings for construction of the sewer he shall furnish them also for its repair; if. the pipes and fittings have been furnished by the Board free for construction of the sewer the Board will furnish at the Contractor’s cost all the pipes and fittings needed to restore the sewer to acceptable condition. Pipes and fittings needed for repairs preliminary to acceptance of the contract or for repair of defects developing during the forty-five day maintenance period shall be furnished under the same conditions, as those just specified.”
 

 [8]
 

 . Paragraph 47 of Section A of the Water Board’s specification reads, in part, as follows: “The Engineer will give all the necessary lines, levels, grades, etc., for the guidance of the Contractor and the Contractor shall be responsible for the conformity of the work thereto. * * ”
 

 [9]
 

 . Some of the provisions of the S&WB specifications made applicable to the contracts are as follows:
 

 “Section A.
 

 “(24) The Sewerage and Water Board reserves the right to change the locations of the structures to be built under this contract for any reason the Engineer deems satisfactory, * * * ”
 

 “(32) When, for the proper prosecution of a contract, work becomes necessary which has not been provided for in any clause of the contract the Engineer will issue an order and the Contractor shall perform the work stated in the order. * *
 

 “(47) The Engineer will give all the necessary lines, levels, grades, etc., for the guidance of the Contractor, and the Contractor shall be responsible for the conformity of the work thereto. * * ”
 

 “(48) The work shall be prosecuted in such manner and from such points, at such times, and with such forces as the Engineer may determine from time to time during the progress of the work.”
 

 Sections B, C and D of the Board’s-specifications set out in
 
 minute
 
 detail how each phase of construction is to be-accomplished, and the testimony indicates that a Board inspector supervised every bit of the work done by McCoy to make sure that each detail required by the Board was followed.
 

 [10]
 

 . Keller’s allegation refers to the following part of paragraph 21(A) : “All work under this contract shall be done to the satisfaction of the General Superintendent who shall in all cases determine the amount, quality, acceptability .and fitness of the several kinds of work .and materials which are to be paid for hereunder and shall decide all questions which may arise as to the fulfillment of this contract on the part of the Contractor and his determination and decision thereon shall be final and conclusive and such determination and decision, in case any question arises, shall be a condition precedent to the right of the Contractor to receive any money hereunder.”