169 So.2d 122 (1964)
PITTMAN CONSTRUCTION COMPANY
v.
HOUSING AUTHORITY OF NEW ORLEANS.
No. 1393.
Court of Appeal of Louisiana, Fourth Circuit.
November 2, 1964.
Rehearings Denied December 7, 1964.
Writs Refused February 5, 1965.
*125 Deutsch, Kerrigan & Stiles, Malcolm W. Monroe, New Orleans, for Pittman Const. Co. and others.
Guste, Barnett & Little, William J. Guste, Jr., New Orleans, for Housing Authority of New Orleans.
Graham & Graham, Louis B. Graham, New Orleans, for E. F. Minyard, d/b/a Rockwool Insulation Co. and Fidelity & Deposit Co. of Maryland.
Bienvenu & Culver, H. F. Foster, III, New Orleans, for Houston Fire and Cas. Ins. Co.
Reuter, Reuter & Schott, J. Richard Reuter, Jr., New Orleans, for American Employers Ins. Co.
Michael E. Culligan, Jr., Mandeville, for Labiche Plumbing Service, Reed Hardware Co., and Nomac Const. Co.
A. J. Marciante, New Orleans, for Brindell-Bruno, Inc. and Royal Indemnity Co.
Lemle & Kelleher, H. Martin Hunley, Jr., New Orleans, for Indemnity Ins. Co. of North America.
Bernard, Micholet & Cassisa, Peter L. Bernard, Jr., New Orleans, for L. M. Rube and United States Fidelity & Guaranty Co.
Claire Loeb and Donald R. Brian, New Orleans, for S. O. Bynum, d/b/a Southern Tree and Landscape Const. Co.
Albert B. Koorie, New Orleans, for Walter J. Barnes, d/b/a Walter Barnes Elec. Co.
Bienvenu & Culver, H. F. Foster, III, New Orleans, for Robert L. Thompson, d/b/a Alpha Pest Control.
Florence Dodge, Joseph E. Friend, New Orleans, for Miami Roofing Co., Inc., and All Florida Surety Co.
Before McBRIDE, YARRUT, SAMUEL, HALL and TURNER, JJ.
HALL, Judge.
Pittman Construction Company (Pittman), as general contractor, filed suit on November 15, 1955 against the Housing Authority of New Orleans (HANO), as owner, for materials furnished and work performed by plaintiff in the construction of Section 1 of the Desire Street Housing Project under the prime contract executed by the parties on March 3, 1953.
Pittman's main contentions are (a) that it completed in accordance with the plans and specifications all work which it was required and permitted by HANO to perform except certain relatively small items (credit therefor being allowed by Pittman) and that it is entitled to recover from HANO (a) $555,801.94 being the alleged net balance of contract funds retained and withheld by HANO to secure completion of the work; and (b) that it is entitled to recover additional sums which total $518,872.74 as the value of extra work which it was required by HANO to perform all of which was rendered necessary by serious latent subsurface soil conditions encountered during the progress of the work.
*126 In its pleadings HANO denies that Pittman completed the work as required by the contract, and contends that, on the contrary, Pittman abandoned the project and is not entitled to recover any part of its claims for the retained contract funds or the extra work; and in a reconventional demand and third-party petition filed against Pittman and its sureties, HANO urged claims which total $1,477,824.42, composed of seven items: (1) $357,424.62 paid to R. P. Farnsworth & Co., Inc. under a contract of January 18, 1956 for "remedial work"; (2) $5,167.70 as the value of work HANO elected not to do; (3) $306,860.00 as liquidated damages; (4) $19,628.41 for additional maintenance costs and fees; (5) $379,203.35 for claims recorded against the project; (6) $229,738.34 the total sum asserted in suits filed against HANO by material men and subcontractors; and (7) $179,802.00 for attorney's fees.
In answer to HANO's reconventional demand and third-party petition, Pittman and its sureties denied that they are liable to HANO for any part of the claims asserted by HANO, but, by way of alternative relief, Pittman filed third-party petitions against the various subcontractors and their sureties praying for judgment over against each of them respectively for such sums as might be established to be due by Pittman to HANO under the reconventional demand in relation to the respective scope of the work of each.
The responsive pleadings of the subcontractors and their sureties need not be noted except as may be required hereafter.
Following a protracted trial on the merits which was commenced on October 14, 1958 and concluded on June 1, 1960 the District Judge rendered judgment in favor of Pittman and against HANO for the net amount of $587,113.85 calculated as follows:

 Items allowed Pittman
(1) Balance of retained contract funds withheld by HANO $552,439.28
(2) Extra for shell furnished in excess of contract requirements 27,005.16
(3) Extra for fill furnished in excess of contract requirements 49,709.33
(4) Amount admitted by HANO to be due for extra work performed
 by subcontractor, Brindell-Bruno, Inc. 171.66
 ___________
 Total Allowances $629,325.43
 Less
 Items allowed HANO on its reconventional demand
(1) Net cost of completion of a retaining wall $4,562.14
(2) Net cost for hooking up spare heaters 7,280.96
(3) Net cost for installing certain sidewalks 801.86
(4) Net cost for installing certain asphalt paving 3,680.78
(5) Cost under Farnsworth contract for various electrical work 3,685.18
(6) Cost under Farnsworth contract for installing concrete
 aprons 884.46
(7) Cost under Farnsworth contract for redoing caulking
 work 16,994.42
(8) For cleaning bird nests out of hot water flues 1,215.94
(9) For correcting paint work and not using Dianol in the paint 2,034.84
(10) Cost of stolen padlocks 541.00
(11) For "removing stained brick work" 530.00
 __________
 Total Deductions $42,211.58

*127 In rendering judgment in favor of Pittman against HANO for the net amount of $587,113.85 the District Judge specified that no interest would be allowed thereon.
The District Judge also rendered judgment on the various subcontractors' claims as hereinafter noted.
Finally the Court below held that each party to the litigation should bear its own costs.
From this judgment appeals were taken by the following:
(1) Pittman and its sureties.
(2) HANO.
(3) E. F. Minyard, d/b/a Rockwool Insulation Company (subcontractor) and its surety.
(4) Houston Fire & Casualty Insurance Company, surety of R. L. Reed, Jr., d/b/a Reed Hardware Co. (subcontractor).
(5) American Employers' Insurance Company, surety of Labiche Plumbing Service (subcontractor).
(6) Labiche Plumbing Service (subcontractor).
(7) Reed Hardware Company (subcontractor).
(8) D. N. Norton, d/b/a Nomac Construction Company (subcontractor).
Answers to the appeals of Pittman, HANO, and others were filed by the following subcontractors:
(1) Brindell-Bruno, Inc.
(2) S. O. Bynum, d/b/a Southern Tree and Landscape Company, and
(3) Miami Roofing and Sheet Metal Works, Inc.
The record in this case is monumental. It consists of two volumes of "pleadings" containing in excess of 600 pages; 5,146 transcript pages of testimony comprised in 23 volumes; and several hundred pages of exhibits, some of them quite voluminous. Counsels' "briefs" themselves aggregate in excess of 800 pages. Manifestly it would be utterly impractical for us to attempt to comment on the facts in any detail. Fortunately, we find, after reviewing this prodigious record, that the facts essential to a consideration of the basic questions presented herein are clear and relatively undisputed.
The defendant, Housing Authority of the City of New Orleans, a "public body corporate and politic" organized under the provisions of LSA-R.S. 381 et seq., having selected a site upon which to construct its fourteenth low-rent housing project situated in the City of New Orleans, entered into a contract on March 19, 1951 with ten firms of New Orleans architects for architectural and engineering services for the planning, design, development and construction of its Desire Street Housing Project No. L.A. 1-14. The architects were employed to design the project, to prepare all plans and specifications in collaboration with engineers to be employed by them, and to supervise and inspect construction. In conformity with their contract with HANO the associated architects employed B. M. Dornblatt for the civil engineering work, a mechanical engineer (Salzer), an electrical engineer (Goodman) and a landscape architect (Weidhorn).
The plans and specifications prepared by the architects and their associated engineers describe in minute detail exactly what work was to be done, the quality and quantity of all materials, the precise manner and sequence of performance; and the special conditions, and the detailed specifications are replete with provisions which insured HANO's absolute control over every part of the work from start to finish.
The plans and specifications were 20 months in the making, after which HANO advertised for bids covering the construction of Section 1 of the project containing 18 buildings in which there are 508 dwelling *128 units consisting of 2,798 rooms and all necessary facilities. Pittman's bid of $4,369,864.00 was the lowest submitted and it was awarded the contract. The contract was executed by the parties on March 3, 1953 and construction was begun immediately thereafter.
During the course of construction extensive soil subsidence took place. As found by the Trial Judge: "By January of 1954, large areas in various sections of the construction site had subsided from six to eighteen inches, and the rest of the site had subsided up to six inches. As construction continued the site subsidence progressed very rapidly, and between the time of commencement of work on the development in March 1953, until plaintiff's tender of the project on June 10, 1955, subsidence ranging from almost fifteen inches to thirty inches had occurred over the entire site." It is this rapid, inordinate and extensive subsidence of the site which has given rise to this protracted litigation. The principal and decisive issue is whether the responsibility for the loss occasioned thereby should rest with the owner, HANO, or whether it should be borne by Pittman, the prime contractor. Generally speaking the claims of the subcontractors are related to the same issue.
Subsurface soil conditions affecting installation of the sewer and drain lines were noted by Pittman as early as July 1953. In an effort to correct the situation HANO provided in Proceed Order No. 1 (which was supplemented by Proceed Order No. 2) for the installation (as an extra) of planking and shell bedding under the lines. Later when it was becoming evident that the subsurface soil conditions were causing a general subsidence of the site Pittman had a survey made by Gandolfo in January 1954. Pittman promptly advised HANO that this survey had established a general subsidence throughout the site, and as much as fifteen inches in some sections; that considerable additional fill would be required; and that a substantial adjustment in price would be necessitated; and requested written instructions to enable the contractor to proceed. Somewhat more than a month later HANO instructed plaintiff "to proceed with the completion of the work in strict compliance with the plans and specifications."
Despite repeated warnings by Pittman of continued subsidence and of resulting problems in construction and damage to site improvements, HANO did nothing about it except to instruct Pittman again and again to proceed with the construction of the project "in accordance with the plans and specifications."
There can be no doubt that Pittman performed the work in strict accordance with the plans and specifications. Every detail of every phase of the work was subjected to the most rigid inspection by HANO's representatives, and as to some aspects of the work by representatives of the Sewerage and Water Board, and the record is replete with admissions by the various inspectors that the work performed and materials furnished by Pittman complied in every respect with the plans and specifications. Furthermore, "HANO's contracting officer," its "clerk-of-the-works," and its supervising architect certified in each of twenty-three monthly Periodical Estimates that the work included therein "had been performed or supplied in full accordance with the Drawings and Specifications and the terms and conditions of the contract."
In Periodical Estimate No. 23 for the period ending March 1, 1955 HANO's representatives certified that 97.79% of all work valued at $4,273,327.00 (exclusive of materials stored) had been completed "in full accordance with the Drawings and Specifications and the terms and conditions of the contract" and on March 25 Pittman was paid $23,847.64 due under this monthly estimate. However, in spite of the fact that the "clerk-of-the-works" representing the associate architects and engineers approved Periodical Estimate No. 24 for the period ending April 1, 1955 (which *129 showed that 98.1 per cent of all work had been satisfactorily completed) HANO refused to pay Pittman the sum of $28,575.74 due on that estimate.
Finally, after many requests by Pittman for such payment, HANO on May 19, 1955 advised the contractor that this and all further payments "will be withheld pending the correction by the Pittman construction of the deficiencies noted" in HANO's punchlist of May 3, 1955.
The punchlist of May 3, 1955 listed as "deficiencies" which Pittman was required to correct "Items that have not remained at plan elevation (emphasis supplied): (a) all sidewalks, (b) all concrete drives, (c) all storm drains, (d) all sewer mains, (e) all concrete curbs, (f) all finish site, (g) all fill under buildings, (h) all light standards, (i) all fire hydrants, (j) all electrical poles."
HANO thus sought, without issuing the appropriate change orders which Pittman had repeatedly requested, to require Pittman once again to perform the work which it had already performed under strict inspection in accordance with the plans and specifications. The punchlist also required Pittman to repair all damage resulting from subsidence as evidenced by "(a) all swing joints are not in horizontal position; (b) all cast iron spouts are pulling loose from buildings; (c) all sewer lines under buildings are pulling loose from stacks; and (d) all water lines under buildings are pulling hangers loose."
Taking the position that it had performed, as far as it was required and permitted to do, all work in accordance with plans and specifications, and that HANO had breached the contract by refusing to issue appropriate change orders and by refusing to make payment for work already earned and to be earned, Pittman on June 10, 1955 formally tendered the project to HANO. HANO refused to accept it, taking the position that Pittman "walked off the job" without completing the work and thereby defaulted on its contractual obligations. Some several months later viz. on January 18, 1956 HANO entered into a contract with R. P. Farnsworth & Co. to perform certain work on the Project some items of which had been covered by the former contract with Pittman.

OPINION
We are of the opinion that HANO's refusal to pay Pittman the amount of Progress Payment No. 24, as required by the contract, was an active breach of the contract by HANO and fully justified Pittman's refusal to proceed with the work which it had substantially completed and entitles Pittman to recover the balance due under the contract. See Bergen v. City of New Orleans, 35 La.Ann. 523; Guerini Stone Co. v. P. J. Carlin Const. Co., 248 U.S. 334, 344-345, 39 S.Ct. 102, 63 L.Ed. 275; United States for Use and Benefit of Pickard v. Southern Construction Company, 6 Cir., 293 F.2d 493, 496; Arendsen v. Edw. D. Boyle & Co., 9 La.App. 367, 119 So. 282.

Subsidence
As previously noted the decisive issue is who should bear the loss occasioned by the subsidencethe owner or the contractor?
Pittman contends that the loss should be borne by HANO for each of two independent reasons:
a) That HANO, as owner, impliedly warranted the plans and specifications to be adequate to produce a usable housing project, and that the damage occasioned by subsidence was due to faulty and inadequate design of the Project, and
b) that under the "changed conditions" clause of the contract HANO obligated itself to compensate Pittman, over and above the contract price, for extra work caused by "subsurface or latent conditions at the site materially different from those shown on the Drawings or indicated in the specifications."
*130 HANO contends that there was no express or implied warranty on its part that the site would not settle; and further contends that Pittman encountered no soil conditions materially different from that which Pittman knew about or should have known about before bidding.
Whether HANO can be held to have impliedly warranted to the contractor that the plans and specifications if properly adhered to would produce the desired result depends upon whether HANO, as compared to the contractor, can be charged with having had superior knowledge of the potentiality of future subsidence of the site.
The general rule and its exception has been expressed by the Supreme Court in Keller Construction Company v. George W. McCoy & Co., Inc., 239 La. 522, 119 So.2d 450 in language extracted from its opinion in Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819 as follows:
"The general rule is that, if destruction of a work during the course of construction is caused by defective, inadequate, or insufficient plans and specifications furnished by the owner, the contractor is nevertheless liable.[1]
* * * An exception to this rule is recognized where the owner expressly or impliedly warrants the sufficiency of the plans furnished by him. * *
"* * * If the owner through his architect or engineer can be regarded as having superior expert knowledge, and on the basis of such knowledge to represent to the builder the feasibility of carrying out the plans, the owner must be held responsible for the consequences of any defects in them. In ordinary cases, perhaps, the builder may be supposed to have sufficient knowledge of what is feasible to make unfounded the assumption of justifiable reliance by him on the superior knowledge of another; but where the work in question involves technical engineering skill, and the plans are made by expert professional men engaged by the owner, there seems good reason for implying a warranty."
In his well reasoned and comprehensive "Reasons for Judgment" the District Judge pointed to the fact that the plans and specifications were drawn up by "some of the finest and most expert architectural and engineering minds in the city and had taken twenty months to draw up the plans and specifications" and stated that "the length of time in planning the project and the great capabilities of the architects and engineers points to a superior knowledge on the part of HANO, especially as compared to the purely practical knowledge of the plaintiff." He further reasoned that "when a contractor is given plans drawn up by such a battery of experts as that in the present case, he would certainly have great assurance of competency of the plans. This faith in the competent planning of the architects and engineers would be (sic) accentuated in the present case by the fact that the contract stated that all work was to be performed `in strict accordance with the specifications and drawings'. Thus, plaintiff might certainly have suspected that a certain amount of subsidence would occur, but in the face of the strict compliance wording of the contract and the superior abilities of the planners, plaintiff's suspicions fade greatly in importance."
Further on this point the District Judge said:
"Testimony at the trial brought out the fact that the defendant actually knew that the site would subside considerably, *131 but did not expect it to subside as quickly as it did. Mr. Rene Gelpi, the supervising architect of the project, stated that the design of the architects was made with the idea of `subsidence taking place over a period of years and not over a period of weeks and months like it actually did'. Mr. B. M. Dornblatt, a civil engineer, and one of the experts primarily responsible for the design of the project, said he `thought the contractor would be through and off the job, and if any of this repair work had to be done, it would have to be done by the owner after acceptance'. The mechanical engineer, Mr. A. R. Salzer, stated that the planners expected no more than three to six inches of subsidence over a long period of time. Over and over again during the trial, it was made clear to the Court that the planners definitely did expect subsidence, but they did not make provisions in the plans and specifications for the expected eventuality. Therefore it is quite apparent that HANO, through its architects and engineers, was fully aware of the potentiality of future subsidence and had greater knowledge of the eventuality than did the plaintiff, general contractor.
"* * * The very presence of the names of the numerous architects and other experts on the documents of the contract would lead one to have strong faith in the sufficiency of the plans and specifications, and, therefore, to act in accordance with this faith, perhaps without making as careful an investigation of the site as might, under other circumstances, seem necessary. The requirement of strict compliance with specifications and drawings and the expert skills of the planners of the project, lead this Court to the definite conclusion that there was an implied warranty on the part of HANO as to the sufficiency of the plans and specifications."
After careful consideration of the entire record we find ourselves in full agreement with the conclusions of the District Judge and we hold that HANO impliedly warranted to Pittman that the plans and specifications, if followed, would produce a usable housing project.
Our analysis of the testimony leads us to the further conclusion that the plans and specifications were inadequate to take care of even the subsidence which the planners anticipated. For instance the 81 houses as well as a large concrete box culvert running through the site were designed to be built on piles but there was nothing in the design to avoid the effect of subsidence on the various utility lines. During the progress of the subsidence the houses and the concrete culvert remained at plan grade but the subsidence of the site carried the utility lines down with it thus breaking or pulling out all connections of the lines with the houses, there not being enough play in the design of the "slip-joints" and swing joints to compensate for the sinking of the site. In like manner the drain lines entering the culvert were carried down and broke loose at the point where they entered it.
Apparently there was little or no coordination in the plans between the design of the sub-surface utility lines and the design of their connections with the houses. The civil engineer, Dornblatt, designed the layout of the sub-surface lines throughout the site up to within five feet of the perimeter of the houses. Salzer, the mechanical engineer, undertook the design of the plumbing in the houses and all the connections with the sub-surface lines. His jurisdiction extended to five feet beyond the perimeter of the houses where the connections were made. While Dornblatt testified that he expected subsidence of perhaps eight to twelve inches while the contractor was on *132 the job and contended that he designed the sub-surface utilities with such subsidence in mind, he did not even discuss the question of subsidence with Salzer. Salzer "didn't expect more than a three, possibly three to six inch subsidence over a long period of time, as has been our experience elsewhere" and "didn't consider * * * that it was any more of a problem than in the past such projects." The result was that the utility connections to the houses were not designed by Salzer to withstand even the amount of subsidence which Dornblatt said he anticipated, much less the amount of subsidence which actually occurred, and when Dornblatt's lines sank with the site they broke and pulled out all the house connections.
Apparently the design was the usual one followed by HANO in connection with its thirteen other projects in spite of the fact that the designers when preparing the plans had been warned by the Sewerage and Water Board (a fact not communicated to Pittman) to beware of unusual subsidence in this area.
The District Judge sums up the situation in the following language:
"Over and over again during the trial, it was made clear to the court that the planners definitely did expect subsidence, but they did not make provisions in the plans and specifications for the expected eventuality."

The "Changed Conditions" Clause
The designers did however incorporate the following clause in the contract:
"Should the Contractor encounter or the Local Authority discover during the progress of the work sub-surface or latent conditions at the site materially differing from those shown on the Drawings or indicated in the Specifications, the attention of the Architect shall immediately be called to such conditions before they are disturbed. If the Architect finds that they so materially differ, he shall at once make such changes in the Drawings or Specifications as he may find necessary, and any adjustments in the Contract price or time as may be justifiable shall be made by means of a written order as provided herein."
And, similarly, the specifications provide that "should latent soil or other conditions require changes, the `contract price' shall be adjusted."
The record shows that although Pittman had brought the site up to planned grade it was compelled by HANO to keep bringing in additional fill as the site went down in order to keep the site at stipulated grade; that HANO refused to issue a change order for any of this additional work, merely instructing Pittman "to proceed with the completion of the work in strict accordance with the plans and specifications;" and that Pittman performed the extra work under protest and with reservation of its right to claim extra compensation therefor.
Pittman contends that this extra fill was rendered necessary by "sub-surface or latent conditions at the site materially different from those shown on the Drawings and Specifications" within the meaning of the above quoted "changed conditions clause" of the contract; that HANO breached the contract by not issuing an appropriate change order therefor; and that Pittman is entitled to the value of this work as an extra.
HANO admits that Pittman furnished extra fill but contends that the contract clearly required that the contractor acquaint himself with the conditions at the site and that Pittman encountered in the subsidence nothing unusual or nothing which Pittman should not have known before bidding. In the alternative HANO charges that Pittman's claim for extras is "grossly exaggerated".
*133 HANO cites a number of clauses in the Specifications which it contends indicated to the contractor that subsidence should be expected, it also puts great stress on the soil borings made by Eustis, and the fact that Pittman had encountered a great deal of subsidence in constructing the Loumette Subdivision which is in close proximity to the site in question here.
It is impossible for us within the limits of this opinion to comment on these matters in any detail. Suffice it to say that the record contains testimony by prominent experts to the effect that the plans and specifications for this project are comparable to the standard ones used throughout the city; that the design was the usual one followed by HANO in construction of its other projects; and that there was nothing in the plans and specifications to indicate that soil subsidence of any degree would be encountered. The District Judge found that "nowhere in the plans was there mention of possible subsidence of the site * * *."
During preparation of the plans the architects ordered some soil borings made by J. Bres Eustis (a soil engineer) particularly as an aid in preparing the piling specifications. The Eustis boring report was available to Pittman when he bid on the Project and HANO contends that it constituted a clear warning that considerable subsidence could be expected. Again the record contains respectable expert testimony from engineers and soils experts that the Eustis borings as well as his report were inadequate and insufficient to permit bidders to make any prediction as to the amount or rate of subsidence. Obviously the Eustis report did not disclose to HANO's experts, who designed the Project, the conditions which were subsequently encountered, otherwise they would have designed it differently.
While it is true that the Loumette Subdivision built by Pittman some years before subsided approximately 18 inches it must be noted that the subsidence there was not as great as the subsidence encountered in the Desire Street Project and that it occurred over a greater length of time and after the contractor had completed the work and sold the houses.
Viewing the evidence as a whole we are of the opinion that the conditions encountered by the contractor during his work were "latent conditions at the site materially differing from those shown on the Drawings or indicated in the Specifications." As a matter of fact HANO itself in Proceed Orders Nos. 1 and 2, authorizing certain extra work, referred to the work as being "due to latent soil conditions affecting installation of sewer, drain lines and water lines."
We are therefore of the opinion that HANO is liable to Pittman under the "changed conditions clause" of the contract for all extra fill which he was required by HANO to furnish in an effort to keep the site up to grade, and as a concomitant HANO is not entitled to recover for any claims which are due to subsidence of the site.

Extra Fill
Pittman claims compensation for 84,549 cu. yds. of loose fill and 17,273 cu. yds. of loose shell which it was required to place on the site to cope with subsidence. The District Judge calculated that he furnished only 43,226 cu. yds. loose fill and 6,478 cu. yds. of loose shell.
With regard to the fill the District Judge found:
(1) That Pittman purchased and brought onto the site a total of 99,955 cu. yds. of loose fill. Pittman claimed that he brought onto the site an additional 7,761 cu. yds. of loose fill from an old railroad levee. The Judge found that this item was based solely on the unsupported testimony of Pittman's superintendent and it is apparent that the judge did not believe him.
*134 (2) That 42,167 cu. yds. of volume was required to be filled in order to raise the site from its natural state to the grade established by the contract documents if there had been no subsidence. This figure is well established by the evidence and is not in dispute. The judge then, erroneously in our opinion, took this figure as representing the amount of compacted river sand required to fill this volume, overlooking the fact that this figure should be reduced by the volume which would be displaced by the installation of the streets, concrete box drain, utilities etc. The volume taken up by the streets, drains, utilities etc. we find to be 20,002 cu. yds. Accordingly the amount of compacted fill required by the contract documents without regard to subsidence is 42,167 minus 20,002 or 22,165 cu. yds.
(3) The District Court found that the "excavation of streets and drives on the project provided approximately 13,043 cubic yards of fill." The figure is correct for "streets and drives" but he overlooked the fact that excavation of the culvert, drains, utilities etc. also provided fill. The total amount of fill provided by excavation is of course the amount of space occupied by all of the installations or 20,002 cu. yds.
(4) The District Judge found that only 50% of the soil removed by excavation was usable as back fill, and the evidence supports this percentage.
(5) The District Judge found that it takes 1.5 cu. yds. of loose river sand to fill one cubic yard of volume. Pittman contends that the "compaction factor" should be 1.25 but the figure used by the Court is supported by competent expert opinion.
(6) The District Judge found that there was no unit price specified in the contract for extra fill, and therefore relied upon the testimony of Mr. Ellis Robbert, landscape contractor, that a fair price would be $1.50 per cu. yd. Pittman strenuously insists that the contract does contain a unit price provision reading: river sand back fill in place (utilities) per cu. yd. $3.75." However, this provision apparently does not refer to rough filling and grading which is done by machines but to back filling of utilities which is largely done by hand. We accordingly adopt the Lower Court's figure of $1.50 per cu. yd.
We conclude that HANO is liable to Pittman for fill in excess of the requirements of the contract in the sum of $88,214.78 calculated as follows:

Total actually furnished by Pittman 99,995 cu.yds. loose
Volume to be filled 22,165 cu.yds.
Multiplied by compaction
factor of 1.5 1.5
 ______
Total fill required 33,247.5 cu.yds. loose
by Contract
Less fill available
from site 10,001
 ______
Total off-site fill
required by contract 23,246.5 cu.yds. loose
 ________
Excess fill furnished 76,708.5 cu.yds. loose

76,708.5 cu. yds. loose fill equals 51,139 cu. yds. compacted in place (76,708.5 divided by 1.5). Therefore Pittman is entitled to payment for 51,139 cu. yds. at $1.50 per cu. yd. *135 or $76,708.50 plus 15% for overhead and profit (a contract provision) or a total of $88,214.78.

Extra Shell
Pittman claims that due to subsidence of the site he was compelled to, and did, furnish 17,273 cu. yds. of shell in excess of contract requirements, and that he is entitled to be paid therefor at the rate of $7.25 per cu. yd., the unit price fixed in the contract documents. The District Court found that he was entitled to compensation for only 3,239 cu. yds. of shell at $7.25 per cu. yd. plus 15% for profit and overhead.
In reaching his conclusion the District Judge followed somewhat the same procedure he used with reference to the fill.
Briefly stated he found that there were 9913 cu. yds. of volume required by the contract to be filled with loose shell, and by using a compaction factor of 2 he converted this into 19,826 cu. yds. of loose shell and added to this 360 cu. yds. of loose shell required for temporary roadways and an estimated quantity of 3700 cu. yds. of loose shell required to stabilize the grade and raise the area four inches, and concluded that the contract actually required 23,886 cu. yds. of loose shell. Subtracting this from the 30,364 cu. yds. which Pittman actually used on the project he found that Pittman furnished 6478 cu. yds. of loose shell, or 3,239 cu. yds. of compacted shell, in excess of contract requirements.
Pittman contends that the Court erred in using a compaction factor of 2, contending that the factor to be used should be 1.7 as testified to by Meyn of the Pittsburg Testing Laboratory. The factor used by the Court was testified to by Cecil Shilstone of the Shilstone Testing Laboratory and we find no manifest error in the fact that the Court followed Shilstone rather than Meyn. Both men are experts in their field.
Pittman also contends that the Court erred in adding 3,700 cu. yds. to the amount required to fill the volume called for by the specifications. The Court did this for the reason that the specifications required, in addition, that the sub-grade be "stabilized" with shell and brought "to a firm unyielding condition." The testimony shows that a quantity of shell had been used for this purpose, having been rolled into and mixed with the soft clay of the sub-grade. Shilstone's testimony shows that four inches of the sub-grade had been so stabilized and he calculated that it took 4,951.76 of loose shell to raise the area four inches.
But the four inches of sub-grade found to be stabilized with shell became a mixture of clay and shell and there is no testimony showing the proportion of shell to clay. Undoubtedly some shell had been rolled into the clay. The question is, how much shell was used for this purpose? The Court made "a conservative estimate" that 3,700 cu. yds. (in round figures) was so used, thus estimating that the clay-shell mixture was composed of ¾ shell and ¼ clay. The record contains no basis for this estimate, but since some shell was used for stabilization of the sub-base, and since Pittman had the over-all burden of proving its claim for extras with exactitude we are of the opinion that Pittman bore the burden of showing either that no shell was used for stabilization or that only a definite quantity was so used.
The District Court held that Pittman was entitled to be paid for 3,239 cu. yds. of compacted shell at $7.50 per cu. yd. plus 15% for overhead and profit or a total of $27,005.16 and we find no error in such holding.
HANO contends of course that Pittman is not entitled to an extra either for fill or shell. Alternatively HANO contends that since the specifications provided for movable swing joints on the gas risers and allowed for three inches of settlement in the design of the soil stacks, that should have been an indication to Pittman to expect three inches of subsidence, and that Pittman's claims for extra fill and shell, as allowed by the District Court, should be reduced *136 accordingly. We do not agree that because the specifications called for some play in the soil stacks and gas risers that that was an indication to Pittman to expect three inches of subsidence, or any subsidence, during the course of construction. Salzer, who designed the soil-stacks and gas risers testified that he "didn't expect more than a three, possibly three to six inch subsidence over a long period of time * * *" (emphasis added), meaning a period of years.

Repairs to Utility Lines
Pittman claims that it expended $9,776.25 in repairing damage to the utility lines and manholes installed by it and that it is entitled to recover this amount plus 15% for overhead and profit as an extra because the damage was caused by subsidence.
The District Court disallowed this claim in toto, holding that the damage to the utility lines was caused principally by Pittman itself in operating heavy machinery over the area occupied by the utilities without protecting them by the use of pallets, and by taking little or no care in crossing the lines. The Court also held that the damage to manholes also resulted almost completely from the use by Pittman of heavy equipment over and around them. The Court held further that if any part of the damage was due to subsidence it was impossible from the evidence to determine the extent thereof. The District Court's findings and conclusions in this respect are clearly supported by the record.

Balance of Contract Funds Due
Pittman claims that after having allowed HANO credit for $19,513.00 for work done ($1,113.00 for sidewalks plus $18,400.00 for asphalt paving) there is a net balance of contract funds due it but withheld by HANO amounting to $555,801.94.
Pittman admits that included in this figure is the amount of $35,000.00 being the limit of Proceed Order No. 2. HANO contends that Proceed Order No. 2 merely called for an estimated addition to the contract "not to exceed $35,000.00;" that later a change order was prepared and signed by the parties in which it was agreed that the actual amount due for the work covered by Proceed Order No. 2 was $31,637.34; that therefore Pittman's figure of $555,801.94 should be reduced by $3,362.66 being the difference between the change order and Proceed Order No. 2.
Pittman does not deny that the change order was agreed to and signed by the parties but contends that since the change order was never actually issued the only amount "fixed by effective contract documents" was the amount of Proceed Order No. 2.
The District Judge agreed with HANO's contention, stating:
"Pittman will recover from HANO the amount of $555,801.94 * * * less $3,362.66, being the difference between Proceed Order No. 2 and the change order G-34, signed by the parties, or a net recovery of $552,439.28."
We agree with the conclusion of the District Judge. We observe however that his reference to the change order signed by the parties as being "change order G-34" is erroneous, this change order having no relevance to the subject matter.

HANO's Reconventional Demand
Having completed over 98% of the contract in strict compliance with the plans and specifications, Pittman is entitled to recover the full contract price plus extras, subject to a credit in HANO's favor for the fair cost of completing contract items left undone and correcting those left in a damaged condition. HANO having itself breached the contract and being in default is not entitled to anything in the way of damages.
*137 The District Judge, properly in our opinion, rejected all items of HANO's reconventional demand which arose out of or were related to subsidence. He did allow HANO credits aggregating $42,211.58 against the recovery awarded Pittman because of uncompleted items and repairs of damage not related to subsidence as follows:
1. $4,562.14 the net cost for completion of a retaining wall.
2. $7,280.96 the net cost for hooking up spare heaters.
3. $801.86 the net cost for installing certain sidewalks.
4. $3,680.78 the net cost for installing certain asphalt paving.
5. $3,685.18 the cost of completing certain electrical work.
6. $884.46 the cost for installing concrete aprons on two drives.
7. $16,994.42 the cost of redoing caulking work.
8. $1,215.94 the cost of cleaning bird nests out of hot water flues.
9. $119.68 for correcting paint work, and $1,915.16 for not using Dianol in the paint.
10. $541.00 the cost of supplying stolen padlocks, and replacing glasses in windows and screens broken by vandals, and for a man hole cover.
11. $530.00 the estimated cost of "removing stained brick work."
In calculating the "net cost" to HANO of items 1 through 4 the District Court first determined that the cost to HANO under the later Farnsworth contract for completing these items was a fair and reasonable cost. From this cost he then deducted the value of the work under the Pittman contract because Pittman had already given HANO credit for this value in computing the contract balance due it. Pittman contends that in allowing HANO the greater costs under the Farnsworth contract, less the sums which it had already given HANO credit for, the Court in effect was giving HANO damages for Pittman's failure to complete these items. We do not think so. The Court determined that the Farnsworth cost was a fair and reasonable cost for completing the items and we find no error in this finding.
The District Court gave Pittman judgment over against the respective subcontractors and their sureties for the credits allowed HANO in items 5, and 7 through 9. These items will be discussed when we consider the subcontractors' claims.
Pittman contends that the credit of $884.46 allowed HANO in item 6 is a duplication, since Pittman had included this item in the credit of $18,400.00 it allowed HANO for the cost of installing asphalt paving (item 4). We have been unable to verify this contention.
Item 10 for $541.00 being the estimated cost of supplying stolen padlocks and replacing broken windows and screens should in our opinion be reduced to $79.95. The record shows that at the time Pittman tendered the project to HANO only 21 padlocks valued at $79.95 were missing. All the other items (36 additional padlocks, the glasses and screens and the manhole cover) aggregating $461.05 apparently disappeared or were broken after tender of the project and at a time when HANO had control and custody of the project.
The District Judge allowed a credit to HANO for $530.00 being the estimated cost of "removing stained brick work." The testimony shows that some of the brick work had become stained by grease, and although HANO did not choose to have the corrective work done, it is entitled nevertheless to a credit in this amount.
The District Court denied the credits claimed by HANO (1) for the failure of Pittman to clean the sidewalks and driveways, (2) for its failure to complete the *138 cleaning and flushing of the storm drains etc. and the installation of cleanouts on the drains, (3) for its failure to furnish asbuilt drawings of the gas distribution system, (4) for non-completion of the landscape work, (5) for not completing the exterior termite control work, and (6) for Pittman's failure to purge the gas lines. These credits were in our opinion properly rejected because as found by the District Court, "the basic cause for failure to carry out this work was the subsidence of the site."
The District Court properly rejected HANO's reconventional claim for liquidated damages, stating:
"HANO seeks to recover $195,922.00 from Pittman in liquidated damages because of the late delivery of the project. This Court is of the opinion that no recovery should be allowed on this claim. The contract specified, in relation to this aspect of the case, as follows:
"* * * the right of the Contractor to proceed shall not be terminated or the Contractor charged with liquidated damages because of any delays in the completion of the work due to unforseeable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to acts of God, * * * acts of the Local Authority, * * *." Gen. Cond. 13.
By far, the greatest cause of the delays encountered during the construction was the inordinate subsidence. Since it has been held that the subsidence became a problem because of the inadequacy of the plans and specifications furnished by HANO, then it is obvious that the delays caused by that subsidence can be held to be caused by `acts of the Local Authority.' This is made even more evident by the fact that HANO refused to allow any extensions for delays caused by the subsidence, and in that HANO did not act with reasonable speed in notifying Pittman of allowances of extensions of time on any delays. The facts show that extensions should have been allowed under the circumstances of the subsidence. Therefore, the claim for liquidated damages will be denied."
HANO's claim in reconvention for $19,594.41 as expenses incurred for the protection of the work "as a result of Pittman's abandonment of the job," and its claim for $179,502.00 as attorney's fees were both properly denied by the District Judge.
As we have seen Pittman did not abandon the job. On the contrary, following HANO's breach of the contract, Pittman, as it had a right to do, formally tendered the project to HANO on June 10, 1955. Thereafter the project was at HANO's risk.
HANO's claim for attorney's fees is apparently based solely on a provision in Pittman's performance bond binding the sureties thereon to protect HANO "from all loss or expense including all costs of court and attorney's fees made necessary or arising from the failure, refusal or neglect" of Pittman "to comply with the obligation assumed by him." There has been shown no "failure, refusal or neglect" on the part of Pittman to comply with its obligations. HANO is the party in default. Besides, inasmuch as the bond is a statutory bond, anything contained therein which is not in the statute, must be read out of the bond. The only provision in the Public Works Act (LSA-R.S. 38:2241 et seq.) for attorney's fees is that allowing attorney's fees to lien claimants under certain conditions.

Net Amount Due Pittman by HANO
For the foregoing reasons we are of the opinion that Pittman is entitled to judgment against HANO in the net amount of $629,410.86 calculated as follows:

*139
 Items Allowed Pittman
1) Balance of withheld contract funds withheld by HANO $552,439.28
2) Extra for shell furnished in excess of contract requirements 27,005.16
3) Extra for fill furnished in excess of contract requirements 88,214.78
4) Amount admitted by HANO to be due for extra work performed
 by sub-contractor, Brindell-Bruno Inc. 171.66
5) Cost of returning fire hydrants to planned elevation (See
 Norton's claim, post) 1,295.67
 ___________
 Total Allowances $669,126.55
 Less
 Items Allowed HANO in Reconvention
 1) Net cost of completion of a retaining wall $ 4,562.14
 2) Net cost of hooking up spare heaters 7,280.96
 3) Net cost for installing certain sidewalks 801.86
 4) Net cost of installing certain asphalt paving 3,680.78
 5) Cost of completing certain electrical work (see subcontractors'
 claims, post) 3,685.18
 6) Cost of installing concrete aprons on two drives 884.46
 7) Cost of redoing caulking work (see subcontractors' claims,
 post) 16,994.42
 8) Cost of cleaning bird nests out of flues (see subcontractors'
 claims, post) 1,215.94
 9) Cost of supplying 21 stolen padlocks 79.95
10) Estimated "cost of removing stained brick work." 530.00
 __________
 Total Deductions $39,715.69

Interest and Costs
The District Court provided in its judgment that the amounts recoverable by Pittman were "without interest" and that "each party shall bear its own costs."
Although the Court did not include any discussions of these subjects in his "Reasons for Judgment" it is apparent that he considered HANO to be an "agency of the State" (See State ex rel. Porterie v. Housing Authority of New Orleans, 190 La. 710, 182 So. 725, where it was so held. See also Marquette v. Housing Authority of Opelousas, La.App., 137 So.2d 374; Public Housing Administration v. Housing Authority of City of Bogalusa, 242 La. 519, 137 So.2d 315) and denied interest under the doctrine pronounced by the Supreme Court in Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627, wherein it was said:
"It is generally held that a state or its agencies cannot be compelled to pay interest upon unpaid accounts unless provision is made therefor by stipulation or by a specific statute; general laws relative to the payment of interest are not applicable. * * *" (Emphasis supplied)
*140 Exceptions to this rule have since been made in condemnation proceedings (See Westwego Canal & Terminal Co. v. Louisiana Highway Commission, 200 La. 990, 9 So.2d 389; Harrison v. Louisiana Highway Commission, 202 La. 345, 11 So.2d 612; Makofsky v. Department of Highways, 205 La. 1029, 18 So.2d 605; Hamberlin v. Tangipahoa Parish School Board, 210 La. 483, 27 So.2d 307; Weiss v. Board of Commissioners for Pontchartrain Levee District, 238 La. 419, 115 So.2d 804; A. K. Roy, Inc. v. Board of Commissioners for Pontchartrain Levee District, 238 La. 926, 117 So.2d 60;) and in actions ex delicto (see Hixson Funeral Home v. State, La. App., 33 So.2d 754; Reeves v. State, 232 La. 116, 94 So.2d 1, and cases cited therein) but the Supreme Court has to date uniformly applied the rule of the Boxwell case in matters arising ex contractu. (See Makofsky v. Department of Highways, 205 La. 1029, 18 So.2d 605; Hamberlin v. Tangipahoa Parish School Board, 210 La. 483, 27 So.2d 307; Jefferson Lake Sulphur Co. v. State, 213 La. 1, 34 So.2d 331; State ex rel. Anderson v. Walker, 233 La. 687, 98 So.2d 153; Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819; see also: Marquette v. Housing Authority of Opelousas, 137 So.2d 374; Orleans Parish School Board v. City of New Orleans, La. App., 156 So.2d 718).
Pittman contends however that the Boxwell rule has been entirely abrogated by the 1960 amendment to Article 3, Section 35 of the LSA-Constitution and that this amendment constitutes not only statutory but constitutional waiver of the prior immunity of all state agencies from liability for interest. As pointed out by Justice McCaleb in Terrebonne Parish School Board v. St. Mary Parish School Board, 242 La. 667, 138 So.2d 104, the 1960 amendment is a "complete revision" of the former section 35 of Article 3.
This amendment reads in part as follows:
"Section 35. The Legislature is empowered to waive, by special or general laws or resolutions, the immunity from suit and from liability of the state, and of * * * political subdivisions, public boards * * * corporations, agencies and authorities and other public or governmental bodies; and each authorization by the Legislature for suit against the State or other such public body, heretofore and hereafter enacted or granted, shall be construed to be and shall be effective and valid for all purposes, as of and from the date thereof, as a waiver of the defendant's immunity both from suit and from liability. * * *"

The point presented by Pittman has not heretofore been passed upon by the Courts, but in our opinion it is well taken.
The statute creating housing authorities in Louisiana provides specifically that the Authority may "sue and be sued."
Article 1938 of the Civil Code (LSA-C.C. Art. 1938) provides that "all debts shall bear interest" and Civil Code Article 1935 (LSA-C.C. 1935) states that interest is the damage due for delay in the performance of an obligation to pay money.
It is our opinion that the provision of the 1960 amendment to the effect that any prior authorization by the Legislature for suit against a State Agency "shall be construed to be and shall be effective and valid for all purposes * * * as a waiver of defendant's immunity * * * from liability," places HANO in the same position as any private litigant with respect to liability for interest. We therefore hold that any amounts awarded in Pittman's favor against HANO should bear legal interest from due date until paid (LSA-C.C. Art. 1938).
HANO contends that "these same arguments in a similar situation were effectively put to rest by Judge Janvier in Jefferson Lake Sulphur Co. vs. State," supra. We find nothing in that case which militates against our holding here. Moreover, *141 that case was decided under the 1946 amendment to Section 35 of Article 3 of the Constitution, which did not authorize the Legislature to waive immunity from liability. (See Duree v. Maryland Casualty Co., 238 La. 166, 114 So.2d 594, and Stephens v. Natchitoches Parish School Board, 238 La. 388, 115 So.2d 793.) It was the holding in the Duree and Stephens cases, as pointed out by Justice McCaleb in Terrebonne Parish School Board v. St. Mary Parish School Board, supra, which occasioned the "complete revision" of the section in 1960.
As hereinafter shown the District Court rendered judgment in favor of certain subcontractors, viz. Brindell-Bruno Inc., S. O. Bynum d/b/a Southern Tree and Landscape Company, and Miami Roofing and Sheet Metal Works Inc., on their counterclaims against Pittman. In each of these instances the Court allowed interest on their claims running "from the tenth day after Pittman Construction Company receives payment of the aforesaid judgment in its favor against the Housing Authority of New Orleans."
The reason for this is because the payment clause of each subcontract obligated Pittman to pay the subcontractor "within 10 days after receipt (by Pittman) of payment from the owner."
Each of the above named subcontractors answered the appeals praying, among other things, that interest be allowed them from date of judicial demand.
The issue thus raised would present grave difficulties were it not for the fact that Pittman in its "Reply Brief" on page 38 concedes that if it is allowed interest from date of default on the amounts due it by HANO, the subcontractors would be entitled to recover interest against it from the same date. We will therefore allow interest on these claims from judicial demand as prayed for.
As to costs, we are of the opinion that since HANO's immunity from liability has been waived "for all purposes" by Section 35 of Article 3 of the Constitution, as amended, HANO is not immune from payment of costs, the provisions of LSA-R.S. 13-4521 having been superceded by the waiver, payment of costs being ordinarily an incident of liability.
While it is true that the Trial Court is granted discretion in the taxing of costs by the provisions of LSA-C.C.P. Art. 1920, the Appellate Courts by LSA-C.C.P. Art. 2164 are given an overriding discretion. We are of the opinion that in this matter costs should be taxed against each party cast.

Subcontractors' Claims
Pittman, in third-party proceedings, prayed for judgment over against his subcontractors for such sums as Pittman is held liable to HANO under its reconventional demand as the result of deficiencies in the work of the subcontractors. Some of the subcontractors made counter demands against Pittman and also against HANO. The District Judge properly disallowed all subcontractors' counter claims against HANO because it is clear from the contract that HANO had contractual relationship with Pittman only.
The District Judge correctly found that Walter J. Barnes Electric Company, subcontractor, failed to complete the electrical work undertaken by him and that the fair cost of completing the work was $3,685.18. Therefore the Court properly held Pittman liable to HANO for this amount and gave judgment in favor of Pittman over against Walter J. Barnes Electric Company and its surety for a like amount. Neither the Electric Company nor its surety appealed.
The District Court held Pittman liable to HANO for $16,994.42 as HANO's cost for correcting the caulking work and gave recovery to Pittman for this amount over against the caulking sub-contractor, E. F. Minyard d/b/a Rockwool Insulation Company. He limited the recovery against Rockwool's surety to $3,000.00, the limit *142 of the surety's liability under its bond, and dismissed Rockwool's reconventional demand against Pittman for $346.00 representing a balance due Rockwool on his subcontract plus the cost of lien inscriptions. Rockwool and its surety appealed.
The District Judge held that the caulking material used by Rockwool did not comply with the specifications. No question of improper workmanship is involved.
The scope of the work required the contractor to "completely seal, with caulking compound, joints around frames of doors, windows, louvers or other openings in exterior masonry walls, except access or ventilating openings to crawl spaces."
The specifications for the caulking compound to be used read in part as follows:
"Caulking compound shall be Kuhl's Plastoid, Pecora, or equal. Compound shall be of proper consistency to be readily worked and not be affected by vibration or long exposure to outside climatic or temperature changes. Compound shall form a thin tough elastic film on surface but remain permanently plastic underneath * * *."
The specifications provided that "joints shall be watertight." They further provided that if materials fail to meet contractual requirements HANO had the right to cause their removal and replacement by proper material and in such event it could demand reparation from the contractor, and provided:
"Neither inspection, testing, approval nor acceptance of the work in whole or in part by the Local Authority or its agent shall relieve the contractor or his sureties of full responsibility for materials furnished or work prepared not in strict accordance with the contract."
The subcontractor chose to use regular Plastoid for the caulking compound. This is not the name of a specific material but is the trade name of several grades of caulking compound manufactured by Plastoid Products Company.
As required by the contract Rockwool submitted to HANO's architects a sample of the compound which it proposed to use together with a chemical and physical analysis of the compound submitted by the manufacturer and, as also required by the contract, Rockwool gave a written guarantee reading in part as follows:
"We are hereby endorsing the enclosed information submitted by the manufacturer, Plastoid Products Company, Inc. and we guarantee that all materials used on the subject job will be in compliance with the sample submitted, and in addition we guarnatee that this product complies with the specifications and page # 19, general conditions of the subject job."
The sample was approved by the architects, and Rockwool commenced the caulking work. At an early stage of the job Mr. Kotteman, the clerk-of-the-works, noted that the caulking was beginning to pull away from the aluminum and called it to Rockwool's attention suggesting that it have a manufacturers representative inspect it which was done. The manufacturer's representative stated it wasn't the fault of the material, and Kotteman warned them that "we were looking to the general contractor for satisfactory completion of the caulking of the opening, and expected it to be acceptable at the time of acceptance of the project." Mr. Gelpi, the supervising architect, was called in. Mr. Gelpi determined that the caulking at that time "was not too objectionable provided it didn't develop into anything worse than the condition that existed at that time."
The subcontractor proceeded with the caulking and as of November 1, 1954 had completed 99% of the job. On January 26, 1955 Kotteman complained in writing to Pittman that "the caulking used is pulling away from wood, brick, aluminum and iron and does not appear to be elastic underneath" *143 and that it was not in compliance with specifications.
Thereafter, at HANO's request, a test was run on a samlpe of the compound by Pittsburg Testing Laboratory. The test revealed that the shrinkage of the compound was 23.55% rather than 8.9% which had been certified by the manufacturer and endorsed and guaranteed by Rockwool. Pittsburg Testing Laboratory also tested a sample of the caulking which had been applied on the houses by Rockwool and found it to be hard on the surface but non-plastic underneath. It was also found that the caulking which Rockwool had applied showed cracks ranging from hair-line to 1/16".
The District Judge found as a fact that "as the work progressed the compound began deteriorating and shrinking considerably" and did not comply with the specifications.
Rockwool contends that it installed the exact material specified by the owner, that it had no choice but to use it, that the owner inspected the work as it progressed and approved 99% of it on progress estimates, that no fault was found in the workmanship, and that if the compound didn't produce the result expected it was the owner's fault and not Rockwool's. Rockwool also calls attention to the fact that there is no requirement whatsoever in the specifications as to shrinkage.
As the District Judge held, the contract gave Rockwool a choice of several possible brands of caulking compound. The owner made no attempt to select the brand that should be used but specified that whatever brand was used should produce a "thin, tough, elastic film on the surface, but remain permanently plastic underneath." The compound selected by Rockwool did not produce this result. While it is true the specifications do not in terms refer to shrinkage it seems to us that shrinkage would be an important factor in whether the compound remained plastic underneath, the shrinkage test being a measure of the weight loss caused by the drying out of the compound when exposed to the air.
We conclude that the caulking deteriorated because the compound used by Rockwool did not comply with the specifications, and that Rockwool must bear the ultimate responsibility for the cost of correcting the work.
In order to correct the work the old caulking had to be removed and new caulking installed. The cost for doing this work plus a prorata for the bond, overhead, and profit was determined by the Trial Court to be $16,994.42.
Rockwool elicited testimony in an effort to show that the contractor employed to redo the job did not in fact entirely remove all of the old caulking and Rockwool contends, apparently for this reason, that judgment against it should not in any event exceed the amount of its original contract ($3,000.00). We are of the opinion that the new contractor obligated himself for a stated price to remove the old and apply the new caulking and if he did a bad job it is HANO's concern and not Rockwool's.
The District Judge allowed HANO a credit against Pittman in the sum of $1,215.94 being the cost incurred by HANO in cleaning bird nests out of the hot water flues, and, holding that Miami Roofing and Sheet Metal Works Inc. was responsible for this work under its subcontract with Pittman, the Court gave Pittman a credit for this amount against the amount it owed to Miami. Pittman stipulated that the amount due and owing by it to Miami is $17,443.39, therefore the Court gave Miami a judgment against Pittman and its sureties for the net sum of $16,227.45, "with legal interest thereon from the 10th day after Pittman Construction Company receives payment" of its judgment against HANO.
Miami answered the appeals contending (a) that the judgment rendered against Pittman for the cost of cleaning the hot water flues was erroneous, and (b) that *144 the judgment in its favor should be $17,443.39 with legal interest thereon running from date of judicial demand.
The evidence is clear that when Pittman tendered the project 80 of the hot water flues in 40 separate buildings were blocked by bird nests which interfered with the proper functioning of the flues and were not in "proper working condition" and that Pittman's obligation was to have same "thoroughly cleaned and in proper condition ready for use." The evidence is also clear that the fair cost to HANO for correcting this condition was $1,215.94. We are of the opinion that the judgment of the District Court with relation to the hot water flues is correct except that the judgment in Miami's favor against Pittman should be amended so as to allow Miami interest from date of judicial demand.
The Trial Court allowed HANO a credit against Pittman of $119.68 for correcting paint work, and a further credit of $1,915.16 for failure to use Dianol in the paint as required by the contract, and gave Pittman judgment for these amounts over against R. L. Reed Jr. d/b/a Reed Hardware Co., the painting subcontractor, and its surety, Houston Fire & Casualty Insurance Company. Reed appealed and Houston Fire & Casualty Company filed a separate appeal.
The record shows that R. L. Reed Jr. was Pittman's original painting subcontractor. As the result of a dispute between Pittman and Reed, Pittman on December 21, 1954 entered into a contract with Frank J. Matthew to continue the work Reed had been doing under his subcontract. Matthew then completed the job. Some months later HANO took the position that Dianol, an insecticide, had not been added to the paint on the walls of the bathrooms as required by the contract, and also that paint had been applied over rust spots on some of the building columns, contrary to specifications.
When Pittman filed this suit HANO reconvened for $119.68 for correcting the paint work, and $1,915.16 for failure to use Dianol in the paint. HANO, as plaintiff in reconvention bore the burden of proving these items. The record does not contain any proof whatever that Dianol was not used in the paint, or, if used, was not used in proper proportions. HANO's witnesses testified that they did not know. The only evidence in the record is a stipulation between Reed and HANO that up to the time Reed turned the job over to Matthew he had used 110 pounds of Dianol in the paint out of a total purchase of 200 pounds. Whether Matthew used Dianol in the paint is unknown, and Matthew is not a party to these proceedings. Clearly HANO did not prove its claim against Pittman. Consequently Pittman cannot recover from Reed.
The other item for which claim is asserted by HANO is one for $119.68 for painting over rust spots. HANO's witnesses did not know whether Reed or Matthew did the painting complained of; neither did Pittman know. Furthermore we are not satisfied from the record in these proceedings that the repainting of the columns by Farnsworth under contract with HANO was necessitated by violation of the specifications by either Reed or Matthew.
The record shows that there are several separate suits involving the painting job now pending, untried, in the Civil District Court.
For the foregoing reasons we are of the opinion that HANO's claim against Pittman for the foregoing painting items and Pittman's claim therefor over against Reed and his surety should both be dismissed, without prejudice however to the rights of the parties to assert their respective claims in the suits now pending in the Civil District Court.
D. N. Norton, d/b/a Nomac Construction Company, Pittman's subcontractor who installed the utilities, filed a claim against both Pittman and HANO for $237,934.48. There being no privity of contract between Norton and HANO the District Judge *145 properly dismissed Norton's claim as against HANO. The District Judge allowed Norton's claim as against Pittman to the following extent only:
a) $240.00 for tunnelling under the railroad bed.
b) $1,435.38 stipulated by Pittman to be due Nomac.
c) $1,205.27 for the cost of "returning fire hydrants to planned elevation."
d) $1,949.31 damages to the sewers etc. "shown to have been caused primarily by Pittman's machinery."
All other items of Norton's claim against Pittman were disallowed by the District Court either for failure of proof or for insufficient proof. Norton appealed but his argument and brief fail to convince us of any error in the Court's conclusions.
Pittman correctly points out that the fire hydrants had been installed at planned elevation and that the reason that they did not remain at that elevation was due to subsidence of the site, and we agree with Pittman's contention that since Norton's claim of $1,205.27 has been allowed against it, Pittman should have judgment in turn against HANO for a like amount plus 7½% for profit and overhead, or the sum of $1,295.67.
We do not agree with Pittman's contention that it is entitled to a judgment over against HANO for the item of $1,949.31 because this claim resulted from Pittman's own operations and was not due to "latent, unstable soil conditions."
Brindell-Bruno Inc., one of Pittman's subcontractors, answered the appeals, contending that the judgment in its favor against Pittman in the amount of $8,082.48 is erroneous in that it "fails to award plaintiff legal interest from date of judicial demand and costs but provides for the payment of legal interest from the 10th day after (Pittman) receives payment from (HANO)." Inasmuch as Pittman in its "Reply Brief" indicates its willingness to pay Brindell-Bruno Inc. interest from the date claimed provided Pittman's own claim for interest on its judgment against HANO is allowed, the judgment in favor of Brindell-Bruno Inc. will be amended accordingly.

Farris Lien
In a consolidated proceeding Charles L. Farris, d/b/a Farris Plumbing Supply Company sued Pittman for $24,146.15 due Farris for plumbing materials and supplies furnished and installed in the Desire Street Housing Project. The materials and supplies were sold to and used on the project by Labiche Plumbing Service, one of Pittman's subcontractors. Farris had filed a lien against the project, and it was therefore necessary for Pittman at a cost of $650.00 to file a bond to release the lien. Pittman answered the suit and filed a third-party action against Labiche and its surety, American Employers' Insurance Company, in which it prayed for judgment over against Labiche and American Employers' Insurance Company for any amount Farris might recover against it, plus $640.00 the cost of the bond premium.
American Employers' Insurance Company answered setting forth that under the provisions of the bond they wrote for Labiche there was assigned to them any payments due to Labiche under its subcontract with Pittman; that Pittman owed Labiche an amount in excess of the amount claimed by Farris and that Farris should be paid first and by preference its material man's lien out of any sums due by Pittman to Labiche. Labiche answered admitting its indebtedness to Farris and contended that as claimed by its bonding company Farris should be paid from the amount retained by Pittman out of their contract. Labiche further recited that it had assigned to its surety, American Employers' Insurance Company, any sums due it by Pittman.
The parties stipulated that there was a balance of $24,146.15 owed by Labiche to *146 Farris for materials incorporated in the project and that Pittman bonded out the lien which Farris had filed at a cost of $620.00 for the bond premium. Pittman stipulated that it owed Labiche $38,697.07 on the Labiche-Pittman subcontract.
The District Court accordingly entered judgment as follows:
a) In favor of Farris against Pittman for $24,146.15.
b) In favor of Pittman against Labiche and American Employers' Insurance Company in solido for $24,146.15 plus $620.00 for the bond premium or a total of $24,766.15, and
c) In favor of Labiche against Pittman for $38,687.07.
Pittman did not appeal from the judgment rendered against it in favor of Farris, and Pittman was obliged to pay, and did pay, Farris the amount thereof.
American Employers' Insurance Company, Labiche's surety, appealed contending that the District Court erred: (a) in rendering a judgment in favor of Labiche against Pittman for $38,697.07 and in the same judgment rendering a judgment in favor of Pittman against Labiche and its surety for $24,146.15 plus $620.00, and (b) in rendering any judgment against Labiche's surety in view of the fact that Pittman owed Labiche more than sufficient to pay the Farris lien. In other words American Employers' contends that a net judgment should be rendered in favor of Labiche for $13,930.92 and no judgment at all should be rendered against it.
Pittman appealed from the judgment rendered against it in favor of Labiche, Pittman's sole contention being that the judgment should be amended so as to direct the deposit of the amount thereof in the Registry of the Civil District Court, on the ground that the funds which Pittman owes to Labiche are affected by a tax lien in favor of the United States.
The record shows that Labiche not only failed to pay for materials used on the project, it also failed to make full payment to the United States for withholding taxes due for its labor. As a result the Government filed liens against Labiche and several tax levies were served on Pittman and its sureties between November 17, 1954 and May 15, 1957, the last levy being in the amount of $30,974.50.
Pittman contends that while the judgment in Labiche's favor might be sufficient to discharge the amount Labiche owes Pittman because of the Farris lien and judgment it is entirely insufficient to discharge that amount and also the government tax levy. Pittman further contends that if the judgment in its favor against Labiche and American Employers' should not stand, Pittman and its sureties would be subjected to exposure of personal liability to the United States for the balance of its tax lien. Pittman therefore seeks affirmance of the judgment rendered in its favor against Labiche and its surety which would leave the contract balance payable by it to Labiche intact to cover the opposing claims of Labiche, American Employers' and the United States, and also seeks to have that contract balance deposited in the Registry of the Court with reservation of the rights of Labiche, as subcontractor, of American Employers' (as surety and as subrogee as to any payment in favor of Pittman) and of the United States to participate therein in concursus as to the final distribution of that fund.
There was of course no way to compel the United States to establish its claim in these proceedings, and it has not elected to do so.
The lien law of the United States relative to unpaid taxes is found in 26 U.S.C.A. § 6321 et seq.
Section 6321 of the law creates a lien in favor of the United States for unpaid taxes due it "upon all property and rights to property, whether real or personal, belonging to" the delinquent tax debtor.
*147 Section 6332 provides that "[a]ny person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand * * * surrender such property or rights (or discharge such obligation) to the Secretary * * *," and further provides that "[a]ny person who fails or refuses to surrender" such property or rights to property upon demand by the Secretary "shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of the taxes for the collection of which such levy has been made * * *."
American Employers' contends that the government lien and levy applies only to "the property or rights to property belonging to" the delinquent tax debtor; that whether a certain property right "belongs to" the tax debtor is a question of State law; that under State law when two persons are indebted to each other compensation takes place between them as a matter of law which extinguishes both debts to the amount of their respective sums (See LSA-C.C. Arts. 2207 and 2208); that the surety may oppose the compensation of what the creditor owes to the principal debtor (See LSA-C.C. 2211); that therefore in this case Pittman's claim of $24,766.15 is fully compensated and extinguished and Labiche's claim for $38,687.07 against Pittman is extinguished in like amount; and therefore the judgment in Pittman's favor for $24,766.15 against Labiche and American Employers' should be reversed and annulled and Pittman's claim denied, and a net judgment should be rendered in Labiche's favor against Pittman for the difference between $38,687.07 and $24,766.15 or $13,920.92.
The fallacy in American Employers' contention is that the two debts are not compensable because they are not equally liquidated and demandable (See LSA-C.C. Art. 2209). Labiche's indebtedness to Pittman is fully due and demandable but Pittman's indebtedness to Labiche is (under the subcontract terms) not due and demandable until 10 days after full payment therefor has been made by the owner to Pittman, and is contingent upon such payment being made.
The District Judge recognized that Labiche's claim against Pittman was not due and demandable by providing in the judgment that interest thereon should run "from the tenth day after Pittman Construction Company receives payment of the aforesaid judgment in its favor against the Housing Authority of New Orleans."
American Employers' also apparently contends that since the subcontract obligated Labiche to deliver the work to Pittman free and clear of all claims and liens, no funds are due to Labiche unless all claims and liens are paid; that therefore Pittman was obligated to deduct the amount of the Farris lien before stipulating the amount of the retainage due Labiche. Of course the subcontract provisions impose no obligations on Pittman in this respect. Moreover, in answer to American Employers' contention, it might possibly be argued by Pittman that since the United States withholding tax is really a part of the payment due labor Labiche has no claim at all against Pittman until satisfaction of the government liens, and American Employers', as surety for Labiche is obligated under its bond for the payment by the subcontractor for all labor performed (LSA-R.S. 38:2241).
However, Pittman makes no such argument and is satisfied with the amount of the judgment rendered against it in favor of Labiche.
Pittman's only contention is that the judgment should be amended so as to direct that the amount thereof be deposited in the Registry of the Court so that Labiche, American Employers' and the United States may contest among themselves their respective rights and priorities in that fund.
*148 We are of the opinion that Pittman as a matter of justice and equity is entitled to such an amendment. The amount of retainage awarded Labiche is entirely insufficient to discharge both the amount of the Farris lien and the government tax levy, and if the judgment is not amended Pittman and its sureties will be exposed to personal liability to the United States for the balance of its tax lien, notwithstanding that the primary liability for the Farris claim and the government tax rests upon Labiche. Pittman's liability is merely vicarious. Nor should Pittman be forced to become a party to any possible controversy between either Labiche or American Employers', as Labiche's assignee, and the United States as to their respective rights to the balance due Labiche under the subcontract.

Decree
For the foregoing reasons the judgment appealed from is amended in part, reversed in part and affirmed in part as follows:
1. That part of the judgment rendered in favor of Pittman Construction Company against The Housing Authority of New Orleans is amended by increasing the net amount awarded Pittman Construction Company from the sum of $587,113.85 to the sum of $629,410.86 and by condemning The Housing Authority of New Orleans to pay interest at the legal rate on such latter sum from June 10, 1955 until paid together with all costs of Court expended by Pittman Construction Company in prosecuting its claim against the said Housing Authority; and as so amended that part of the judgment is affirmed.
2. That part of the judgment rendered in favor of Labiche Plumbing Service against Pittman Construction Company and its sureties, Continental Casualty Company, Massachusetts Bonding and Insurance Company, New Amsterdam Casualty Company and American Automobile Insurance Company, jointly and in solido, in the sum of $38,697.07 is amended by directing that Pittman Construction Company and its aforesaid sureties deposit the amount of said judgment in the Registry of the Civil District Court for the Parish of Orleans for the account of Labiche Plumbing Service, American Employers' Insurance Company and the United States of America as their respective interests may appear, said deposit to be made within 10 days after receipt by Pittman Construction Company from The Housing Authority of New Orleans of the balance of contract funds due it for the work performed by Labiche Plumbing Service; and as so amended that part of the judgment is affirmed.
3. That part of the judgment rendered in favor of Brindell-Bruno Inc. against Pittman Construction Company, Continental Casualty Company, Massachusetts Bonding & Insurance Company, New Amsterdam Casualty Company and American Automobile Insurance Company, jointly and in solido for an aggregate sum of $8,082.48 is amended by providing that the amount of said judgment shall bear interest at the legal rate from date of judicial demand until paid; and by providing that the parties cast shall pay costs of this proceeding and as so amended that part of the judgment is affirmed.
4. That part of the judgment rendered in favor of Pittman Construction Company against R. L. Reed d/b/a Reed Hardware Company and its surety, Houston Fire and Casualty Company, jointly and in solido, in the aggregate sum of $2,034.84 is reversed, and the claim of Pittman Construction Company over against R. L. Reed d/b/a Reed Hardware Company and its aforesaid surety is dismissed at the cost of Pittman Construction Company without prejudice however to the rights of all parties to assert their respective claims in the suits relating to the same subject matter now pending in the Civil District Court for the Parish of Orleans.
5. That part of the judgment rendered in favor of Miami Roofing and Sheet Metal *149 Works Inc. against Pittman Construction Company, Continental Casualty Company, Massachusetts Bonding & Insurance Company, New Amsterdam Casualty Company and American Automobile Insurance Company jointly and in solido for the net sum of $16,227.45 is amended by providing that the amount of said judgment shall bear interest at the legal rate from date of judicial demand until paid and by providing that the parties cast shall pay costs of this proceeding; and as so amended that part of the judgment is affirmed.
6. That part of the judgment in favor of S. O. Bynum d/b/a Southern Tree & Landscape Co. against Pittman Construction Company, Continental Casualty Company, Massachusetts Bonding & Insurance Company, New Amsterdam Casualty Company and American Automobile Insurance Company, jointly and in solido in the sum of $33,500.00 is amended by providing that the amount of said judgment shall bear interest at the legal rate from date of judicial demand until paid and by providing that the parties cast shall pay costs of this proceeding; and as so amended that part of the judgment is affirmed.
7. In all other respects the judgment appealed from is affirmed; costs of this appeal to be borne by The Housing Authority of New Orleans.
Judgment amended in part, reversed in part and affirmed in part.

ON APPLICATION FOR REHEARING
PER CURIAM.
Our attention has been directed to the fact that our decree makes no provision for interest on the judgment for $38,697.07 rendered in favor of Labiche Plumbing Service. This was an oversight, as will appear from the reasoning in the body of our opinion.
Paragraph numbered (2) of our decree is therefore recast and amended so as to read as follows:
"2. That part of the judgment rendered in favor of Labiche Plumbing Service against Pittman Construction Company and its sureties, Continental Casualty Company, Massachusetts Bonding and Insurance Company, New Amsterdam Casualty Company and American Automobile Insurance Company, jointly and in solido in the sum of $38,697.07 is amended by providing that the parties cast shall pay costs of this proceeding, and by providing that the amount of said judgment shall bear interest at the legal rate from date of judicial demand until deposited in the Registry of the Civil District Court for the Parish of Orleans, and by directing that Pittman Construction Company and its aforesaid sureties deposit the amount of said judgment together with interest thereon as herein provided in the Registry of the Civil District Court for the Parish of Orleans for the account of Labiche Plumbing Service, American Employers' Insurance Company and the United States of America as their respective interests may appear, said deposit to be made within 10 days after receipt by Pittman Construction Company from The Housing Authority of New Orleans of the balance of contract funds due it for the work performed by Labiche Plumbing Service; and as so amended that part of the judgment is affirmed."
All applications for rehearing are denied.
Rehearing denied.
NOTES
[1] The Court pointed out that the general rule has been changed by Act 183 of 1958 (LSA-R.S. 9:2771), but since this legislation was held not to be retroactive it has no application here.